## STATE OF MARYLAND *v.* SEDACCA

[No. 9, September Term, 1968.]

*Decided January 21, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN and SINGLEY, JJ.

*Alfred J. O'Ferrall, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, David T. Mason, Assistant Attorney General,* and *Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* on the brief, for appellant.

*Cypert O. Whitfill,* with whom were *T. Carroll Brown* and *Stanley Getz* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellee, Morris Sedacca, was convicted in the Circuit Court for Harford County (DYER, J.), without a jury, of transportation and possession of untaxed cigarettes in violation of Code (1957), Article 81, Section 455. Sedacca raised three defenses in the trial court, *i.e.,* (1) that the statute was unconstitutional on its face, (2) that the statute was unconstitutional as applied to him in the pending case, and (3) that the search and seizure of the cigarettes on November 12, 1965 was an unreasonable and unconstitutional search and seizure so that the cigarettes as evidence against him should have been suppressed by the trial court for this reason. Judge Dyer, after taking substantial testimony and hearing the arguments of counsel for the accused and for the State, rendered a comprehensive and careful written opinion in which he resolved all of the three issues against Sedacca, so far as the violation of Section 455 was concerned, but rendered a verdict of not guilty for alleged violations of Sections 438 and 463 of Article 81. The trial court, on June 7, 1966, sentenced Sedacca to imprisonment for one year

in the Maryland House of Correction and to pay a fine of $500, but suspended the jail sentence upon Sedacca's good behavior and without supervision by the Maryland Department of Parole and Probation upon condition that the fine be paid within the week of sentence. Sedacca paid the fine together with $36 court costs to the Clerk of the Circuit Court for Harford County and the trial court, upon Sedacca's petition, ordered the clerk to deposit the $500 fine in a special account until the final decision of the case by this Court.

On appeal to the Court of Special Appeals, the judgment of the trial court was reversed. The Court of Special Appeals was of the opinion that the search and seizure was unlawful and found it unnecessary to consider the two constitutional issues raised by Sedacca in regard to the statute, itself. We granted certiorari on March 12, 1968.

As we disagree with the conclusion of the Court of Special Appeals in regard to the validity of the search and seizure in this case, it becomes necessary for us to consider the constitutional issues raised by Sedacca in regard to the statute and decided in the trial court. We will consider them in the order indicated and finally will consider the issue in regard to the validity of the search and seizure.

Sedacca, a New York policeman, on the morning of November 12, 1965 purchased 858 cartons of cigarettes in North Carolina. He received from the seller a slip of paper having on it the date with the name of a service station, but with the name of the purchaser left blank, which indicated the following:

| "11½ case King | $ 1,290.30 |
| 1½ " 25 Car. Reef | 216.45 |
| Paid | $ 1,500.75 |
| (with the signature of the seller) | |
| 53 Car. King | 99.11 |
| | $ 1,599.86 |
| | $ 1,500.75" |

On the back of the paper appears:

"13 x 60       780
                78
              858"

Sedacca placed some of the cartons of cigarettes on the rear floor of his two-door 1964 Plymouth sedan, registered in his name in New York State, and the remaining cigarettes in the trunk of his car. The cigarettes on the rear floor of the car were between eight and twelve inches below the level of the windows. He covered the top of the pile of cigarette cartons in the rear of his car with a green chenille double bedspread, on top of which he placed a sweater. He hung his overcoat on a window peg. He testified that the bedspread completely covered the cigarettes— top, sides, front and back. He then started back to New York. He stopped in Maryland at the Maryland House service area on the John F. Kennedy Memorial Highway, Interstate Route No. 95, at about 8 :45 a.m. He first stopped at the Texaco Service Station, which is located to the south of the Maryland House itself, where he had his automobile serviced and filled with gasoline. Approximately ten minutes later, he proceeded to the adjoining parking lot, parked his car, and after checking the chenille bedspread to see that it completely covered the cigarettes in the rear seat area, he locked his automobile and entered the Maryland House to use the rest room and get a cup of coffee.

Two state troopers, Trooper Landbeck and Trooper Shockley, had received information over their radios describing a particular automobile, northbound, which was possibly transporting untaxed cigarettes. The troopers observed an automobile on the parking lot at the Maryland House fitting the description they had received by radio and they also observed that the rear of this vehicle appeared to be heavily loaded.

When Sedacca returned from the Maryland House to his automobile, the troopers decided that they would observe the car for any possible traffic violation. Sedacca, according to the troopers, proceeded from his parked position and ran through a stop sign in the service area. Sedacca denied that he failed to stop as required by the stop sign but this factual issue was resolved against Sedacca by the trial court. Sedacca was immediately pursued by the troopers and was stopped approximately one-eighth of a mile on the highway by Trooper Landbeck, who stopped his unmarked Maryland State Police car about five or six feet behind Sedacca's automobile. Trooper Landbeck got out of his automobile, and he and Sedacca met

near the rear of Sedacca's car. Sedacca inquired why he had been stopped and Trooper Landbeck told him that he had failed to stop for a stop sign upon leaving the parking lot. Sedacca testified that he stated: "I had stopped for the sign, but if he thought I didn't, well, I'm sorry, I apologize." Trooper Landbeck then asked for Sedacca's driver's license and registration card, which were produced, and asked what was Sedacca's occupation. Sedacca stated that he was a New York City police officer and asked if Trooper Landbeck "could grant me some consideration in view of the fact that I didn't believe I went through the stop sign, I believed I stopped, plus the fact that we were both policemen." Sedacca testified that Trooper Landbeck made no reply; Trooper Landbeck testified he stated: "I told him flat, no, I could not do that." Trooper Shockley then arrived and told Sedacca that he and Trooper Landbeck had seen him "run a stop sign." When asked by Trooper Shockley where he was coming from, Sedacca stated "Florida," although this was not correct. Sedacca stated that he did this because "I didn't want Corporal Shockley to become overly suspicious of what I was carrying." The troopers decided to check the serial number of the Plymouth against the registration card. Here again the testimony is conflicting, Trooper Landbeck stating that he asked Sedacca if he would mind if Landbeck checked the serial number and if he (Sedacca) would open the door. Trooper Landbeck stated further that Sedacca, himself, opened the door, but Sedacca denies this, stating that Trooper Landbeck opened the door. Trooper Shockley could not remember who opened the door and the trial court merely found that "the door was opened," but did not find by whom it was opened. In any event, the door was opened and Trooper Landbeck either squatted down on his toes or knelt down to observe the serial number which did match the serial number appearing on the registration card. It was necessary to get close to the serial number which appeared on the door post some 18 inches from the ground in order to see it. While in the squatting or kneeling position, Trooper Landbeck glanced at the material stored in the rear seat area and observed that the spread had slipped away from the bottom of the pile exposing an area approximately 10 inches by 10 inches of a cardboard carton on which

the word "Kool" was visible. Upon questioning, Sedacca admitted that he was carrying untaxed cigarettes (although Sedacca stated he "avoided an answer.") and he was then told that he was also charged with transporting untaxed cigarettes. Agents of the cigarette tax unit were notified and when they arrived at the scene some 30 to 45 minutes later. Sedacca told them that he was transporting untaxed cigarettes, that he did not have an invoice, and that he had additional cigarettes in the trunk of his automobile. Sedacca was taken to the office of the Sheriff of Harford County, an agent of the Comptroller's office swore to and obtained a warrant for Sedacca's arrest for violation of the three provisions of Article 81 already mentioned and the cigarettes were transferred from the Plymouth to the automobile of the agents. In regard to the traffic violation, Sedacca posted $13 as collateral which he later forfeited.

The troopers conceded that they followed Sedacca's automobile to see whether or not there would be any violations of the traffic laws and also to see, if possible, what the contents of the rear portion of the car might be. The trial court found that "The Trooper who did the checking admitted to the additional motive that the opening of the car door might reveal the contents in the rear."

(1)

Sedacca contends that the provisions of Section 455 were too vague and indefinite to create a criminal offense of transporting untaxed cigarettes in interstate commerce without a proper invoice or delivery ticket, and therefore his conviction under such a vague and indefinite statute deprives him of due process of law as prohibited by Article 23, of the Declaration of Rights of the Maryland Constitution and the Fourteenth Amendment to the Constitution of the United States. We do not agree.

Section 455, which was in force on November 12, 1965, provided in relevant part as follows:

> "Every person who shall transport cigarettes upon which a tax is imposed by this subtitle, not stamped as required by this subtitle upon the public highways, roads or streets of this State shall have in his actual possession invoices or delivery tickets for such ciga-

rettes, which shall show the true name and address of the consignor or seller, the true name of the consignee or purchaser, the quantity and brands of the cigarettes so transported. *If the cigarettes are consigned to or purchased by any person in Maryland such purchaser or consignee must be a person who is authorized by the State Tobacco Tax Act to possess unstamped cigarettes in this State.* In the absence of such invoices or delivery tickets, or, if the name or address of the consignee or purchaser is falsified *or if the purchaser or consignee in this State is not authorized to possess unstamped cigarettes,* the cigarettes so transported shall be subject to confiscation. * * *

"*Transportation of cigarettes from a point outside this State to a point in some other state will not be considered a violation of this section provided that the person so transporting such cigarettes has in his possession adequate invoices, bills of lading or delivery tickets which give the true name and true address of such out-of-State seller or consignor and such out-of-State purchaser or consignee.*" (Emphasis supplied.)

As originally enacted by the Acts of 1958, Chapter 1, Section 455 (then Section 438) did not contain the italicized portions of the section. The italicized portions were added by the Acts of 1963, Chapter 344.

By Section 431 (Section 414 of the original Act) there was "levied and imposed a tax to be paid and collected, as hereinafter provided, on *all* cigarettes used, possessed or held in the State of Maryland by any person for sale or use in the State of Maryland on or after July 1, 1957." (Emphasis supplied.) Section 432 (Section 415 in the original Act) enumerated the exemptions among which is that the tax shall not apply "to sales or uses which are not within the taxing power of this State under the Constitution of the United States." By Section 439 (Section 422 in the original Act), it is provided:

"*It shall be presumed that all cigarettes possessed or held in the State of Maryland after July 1, 1957 are subject to the tax herein levied and imposed* un-

less and until the contrary is established, and the burden of proof that such cigarettes are not taxable hereunder shall be upon the possessor thereof." (Emphasis supplied.)

Then follow provisions for the affixing of stamps, various enforcement and licensing provisions, provisions in regard to the making and maintenance of records, provisions in regard to investigation by the Comptroller or his authorized agent and then come the provisions in regard to the transportation of cigarettes of which Section 455 is one.

It will thus be seen that Section 455 is an important provision for the enforcement of the cigarette tax and taken together with the presumption established by Section 439, it applied to all unstamped cigarettes transported on the State's highways so that invoices or delivery tickets were required for all unstamped cigarettes whether or not they might be ultimately determined to be subject to exemption under the statute. It is the failure of the transporter of unstamped cigarettes to have in his actual possession the invoices or delivery tickets with the required information which is the crime established by Section 455. The words "upon which a tax is imposed by this subtitle" does not, in our opinion, make the criminal provision vague or indefinite because, as we have indicated, Section 439 presumptively imposes the tax on all cigarettes possessed or held in Maryland after July 1, 1957.

It is in this statutory setting that the Act of 1963, Chapter 344 was passed which added the italicized portions of Section 455 to which reference has already been made. It is clear to us that the amendments of 1963 were intended to strengthen the existing provisions of Section 455. The first two amendments strengthened the enforcement provision by an additional requirement that the Maryland consignee or purchaser must be a person authorized by the statute to possess unstamped cigarettes in Maryland. The third amendment strengthened the original statutory provision by indicating that the transportation of cigarettes from outside of Maryland to a point in some other state would not be considered a violation if the transporter had in his possession adequate invoices, bills of lading or

delivery tickets which give the true name and true address of the *out-of-state seller or consignor and the out-of-state purchaser or consignee.* In short, the legislative intent was not to weaken or eliminate the requirement that the interstate transporters have adequate and accurate invoices and delivery tickets but was to require in addition, that such transporters have such invoices, delivery tickets and bills of lading giving the names and addresses of the out-of-state sellers or consignors and purchasers and consignees.

It is clear to us that a person of common intelligence construing the statute would be adequately informed that if he is transporting unstamped cigarettes through Maryland, he must have the required documents or be guilty of the misdemeanor provided in the statute. Such persons would not be required to guess at its meaning or differ in regard to its application. See *Cramp v. Board of Public Instruction,* 368 U. S. 278, 286-87, 82 S. Ct. 275, 280-81, 7 L.Ed.2d 285, 292 (1961). Inasmuch as there is no doubt in regard to the scope of the statute, the question of a construction in favor of the taxpayer and against the State does not arise. See *Comptroller of the Treasury v. M. E. Rockhill, Inc.,* 205 Md. 226, 234, 107 A. 2d 93, 98 (1954).

Sedacca contends that the title of the Laws of 1963, Chapter 344 did not indicate a legislative intent to create a substantive crime for the tranporting of cigarettes in interstate commerce without the requisite documents. The title to the Act of 1963, Chapter 344 was as follows:

"AN ACT to repeal and re-enact, with amendments, Sections 444½, 453 and 455 of Article 81 of the Annotated Code of Maryland (1962 Supplement), title 'Revenue and Taxes', sub-title 'State Tobacco Tax Act', providing for the sealing of vending machines found in violation of the law and prescribing penalties for tampering with such seals, to make the provisions for assessments conform to the imposition of the tax and to make such assessments liens on the property of the taxpayer, and to provide that consignees of unstamped cigarettes in Maryland must be authorized

to receive the same, AND RELATING GENERALLY TO THE SALE AND USE OF SUCH CIGARETTES."

As we have seen, however, the substantive crime was already in existence under the original provisions of the Acts of 1958. Chapter 1 and the addition of the second paragraph was a strengthening provision, not the creation of a new substantive crime. The title to the Acts of 1963, Chapter 344 is entirely consistent with the legislative intent as we have set it forth.[1] In our opinion, the provisions of Section 455 are constitutional on their face.

### (2)

Sedacca, however, contends that even if Section 455 is constitutional on its face, it is unconstitutional so far as he is concerned, inasmuch as the proof in this case establishes that the cigarettes were in interstate commerce and the State of Maryland cannot constitutionally require carriers of goods in interstate commerce to possess designated documents.

Sedacca correctly points out that Article 1, Section 8, Clause 3 of the Constitution of the United States gives the power to the Congress to regulate interstate and foreign commerce and that this power is supreme and plenary. It is a limitation upon the power of the States but the Supreme Court of the United States has never held that the States are without the power to impose *any form of regulation* of goods moving in interstate commerce. As Mr. Justice Frankfurter, for the Supreme Court, aptly stated in *Freeman v. Hewit,* 329 U. S. 249, 253, 67 S. Ct. 274, 277, 91 L. Ed. 265, 272 (1946) :

"But, in the necessary accommodation between local

---

1. Section 455 was further clarified by the provisions of the Acts of 1966, Chapter 117 which eliminated the words "upon which a tax is imposed by this subtitle, not stamped as required by this subtitle," and substituted the words "not bearing Maryland cigarette stamps." This change was stated in the title of the Act "to clarify the provisions relating to transportation of cigarettes." By this same Act the offense was changed from a misdemeanor to a felony. In our opinion, this clarifying legislation did not change in any essential manner, the criminal provisions already set forth in Section 455.

needs and the overriding requirement of freedom for the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest is remote or unsubstantial. A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests."

The police regulation in Section 455 requiring the possession of the prescribed documents by interstate transporters of cigarettes was necessary for the safeguarding of the State's vital interest in preventing the diversion of cigarettes into illicit channels of trade in Maryland where the State would be unable to collect its tax. The police regulation is a reasonable one, is one with which honest and law abiding citizens can readily comply and is no impediment to the free flow of trade and commerce between the several States. Indeed, the Supreme Court has sustained a State regulation upon interstate transportation which is far more stringent than that imposed by Section 455. In *Carter v. Commonwealth of Virginia,* 321 U. S. 131, 64 S. Ct. 464, 88 L. Ed. 605 (1944) the Supreme Court, independently of the Twenty-first Amendment, sustained an Act of the Commonwealth of Virginia which required a carrier transporting intoxicating liquor through the Commonwealth (1) to use the most direct route and have in its possession a bill of lading showing the route to be used; (2) post a bond in the penal sum of $1,000 conditioned upon lawful transportation through the Commonwealth; and (3) have in its possession a bill of lading showing the name of the true consignee and also showing that the consignee had a legal right to receive the intoxicating liquor at the stated destination. In view of the Supreme Court's decision in *Carter,* it appears unlikely that the Supreme Court would hold the milder regulation imposed by Section 455 to be an unreasonable State burden on interstate commerce.

Sedacca further contends, however, that by the passage of the Act of October 19, 1949, and its amendments, 15 U.S.C. §§ 375-78, in regard to the collection of State cigarette taxes, Congress has preempted the field of State cigarette tax law enforce-

ment and the provisions of Section 455 are therefore ineffective and void. We do not agree with this contention.

15 U.S.C. § 376 requires any person selling or transferring for profit cigarettes in interstate commerce whereby such cigarettes are shipped into a state taxing the sale or use of cigarettes to other than a distributor licensed by, or located in the state, to file with the Tobacco Tax Act Administrator of the state (defined in § 375 (5) as the State official authorized to administer its cigarette tax law—in the present case, the Comptroller), a statement setting forth his name, trade name, and addresses of places where his business is conducted. This section of the Federal Statute also requires the filing with the Tobacco Tax Administrator of the state a memorandum or a copy of the invoice covering each and every shipment of cigarettes made into the state, which in each case must indicate the name and address of the person to whom the shipment was made as well as the brand and the quantity thereof.

The purpose of Congress in passing the Act of October 19, 1949 (the Jenkins State Cigarette Taxes Act) as stated in Senate Report No. 644 of the Senate Committee on Finance (which repeated in substance the House Report on the same bill) was as follows:

"The purpose of this bill is to assist the States in collecting State-imposed sales and use taxes on cigarettes.

THE NEED FOR THIS LEGISLATION

"The avoidance of States sales and uses taxes on cigarettes by interstate shipments in States taxing cigarettes is depriving the States of large amounts of sorely needed revenue. It is believed that this revenue loss to the States amounts to approximately $40,000,-000 annually. Moreover, it is the general opinion of the State tax administrators that the percentage of loss, as well as the aggregate loss, is steadily mounting throughout the 40 States that now impose cigarette taxes. This is particularly deplorable in view of the fact that many of the States earmark revenues from their cigarette taxes for such uses as payment of veterans' bonuses, public assistance, education, aid to the blind,

and the improvement of penal and charitable institutions.

\* \* \*

"Accordingly, your committee believes that respect for the laws of the sovereign States will be furthered by the passage of this bill and that *the public interest will be served by eliminating any inference that the Federal Government approves the circumventing of State laws.*" (Emphasis supplied.) (1949, U. S. Code Cong. Service, at 2158-60.)

It is entirely clear that Congress did not attempt to preempt the field of state enforcement of its sales and use taxes on cigarettes; on the contrary, the declared purpose of the legislation and the provisions of the legislation indicate that the Federal legislation is intended to assist and supplement the enforcement of the state laws.

The amendments to the original Federal Act by the Act of August 15, 1953 and the Act of August 9, 1955 in no way changed the purpose of the original Act; on the contrary, they further strengthened and extended the purpose of the original Act. See 1955, U. S. Congressional and Administrative News at 2883-85.

It is clear that the provisions of the Federal statute do not purport to cover all of the aspects of the enforcement of the state cigarette tax laws, as, for example, the wholesale and retail dealers who sell or transfer for profit to others cigarettes in interstate commerce who will ultimately transfer them to other states without paying the state tax.

As we have indicated, there was no intention on the part of the Congress to preempt the field of state enforcement; rather the congressional intent was to strengthen and effectuate state enforcement of the cigarette tax laws. See *Consumer Mail Order Ass'n. v. McGrath,* 94 F. Supp. 705 (D.D.C. 1950); *aff'd., Mem.,* 340 U. S. 925, 71 S. Ct. 500, 95 L. Ed. 668 (1951); *Neeld v Giroux,* 24 N. J. 224, 228-29, 131 A. 2d 508, 511 (1957). 15 U.S.C. § 378 gives the United States District Courts jurisdiction to prevent and restrain violations of the Federal Act and § 377 provides that the violation of any provision of

the Federal Act is a misdemeanor with punishment of a fine of not more than $1000 and imprisonment for not more than 6 months, or both. These provisions have been held not to give the Federal Courts exclusive jurisdiction of enforcement and the power of enforcement also remains in the state courts. *Angelica Co. v. Goodman,* 52 Misc. 2d 844, 276 N.Y.S.2d 766 (Sup. Ct. N. Y. County 1966).

In our opinion, the provisions of Section 455 are not invalid as unreasonable restraints upon interstate commerce or as regulations in an interstate commerce regulatory area in which Congress has preempted the field.

### (3)

We now come to the last question to be considered, i.e., whether or not the search and seizure of the cigarettes under the circumstances stated above was unconstitutional as conflicting with Sedacca's constitutional rights under the Fourth Amendment to the Constitution of the United States against an unreasonable search and seizure, under *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961) and *Buettner v. State,* 233 Md. 235, 196 A. 2d 465 (1964). Judge (later Chief Judge) Prescott stated, for the Court, in Buettner :

> "It is true that *Mapp* extended to state criminal prosecutions the prohibition against the use by the State in a criminal proceeding of evidence obtained as the result of an illegal search and seizure. However, the Fourth Amendment, which is, of course, controlling does not proscribe all searches and seizures made without a search warrant, but it inhibits 'unreasonable' searches. *United States v. Rabinowitz,* 339 U. S. 56; *Givner v. State,* 210 Md. 484, 124 A. 2d 764." (233 Md. at 239, 196 A. 2d at 467)

In view of the fact the search and seizure of the untaxed cigarettes was made without a warrant, the question presented to us for decision on this point is whether or not the search and seizure was *unreasonable.*

It is well established, as pointed out in the opinion of the Court of Special Appeals in this case, that an arrest may not

be used as a mere pretext to search for evidence. That court concluded from its examination of the circumstances, that the arrest of Sedacca "for the traffic violation was merely an excuse to search the car for evidence of another suspected crime" (2 Md. App. at 622, 236 A. 2d at 313), and hence the search and seizure was unreasonable. We do not agree with this conclusion. The testimony and the findings of the trial court indicate to us that the arrest of Sedacca was a bona fide arrest for a traffic violation committed in the presence of the troopers. Code (1957), Article 66½, Section 233 (b) requires the driver of a vehicle to come to a full stop in obedience to a stop sign. The violation of this section is made a misdemeanor and is punishable by a fine under Article 66½, Section 235 (d). Sedacca, as a non-resident, was not entitled to have a summons issued for the offense (Article 66½, Section 321) but was required to be taken to the nearest magistrate for a hearing or for the posting of bond. See Article 66½, Section 320. In spite of Sedacca's somewhat half-hearted and apologetic denial that he failed to stop in obedience to the stop sign, the weight of the evidence supports the trial court's finding of fact that he did violate this provision of the Maryland law. Sedacca posted $13 collateral for the traffic violation and subsequently forfeited this collateral.

The testimony does indicate that the troopers had a suspicion that Sedacca's automobile was carrying untaxed cigarettes and that they were hopeful that if and when a violation of the motor vehicle laws occurred in their presence, they might possibly obtain sufficient information as a result of the arrest of Sedacca for that crime and an investigation incident to that arrest, to discover what was being transported in the rear section of the heavily loaded vehicle. It was a legitimate part of the investigation incident to the apprehension of Sedacca for the bona fide traffic violation, to check the serial number of the vehicle against the serial number appearing on the registration card, as this might indicate whether or not the automobile was, prima facie, a stolen vehicle. The trial court found that the trooper "who did the checking admitted to the *additional motive* that the opening of the car might reveal the contents in the rear." (Emphasis supplied.) The trooper who checked the serial number on the

door had *two motives,* one to make a bona fide and routine check of the serial number, the other to ascertain if possible in the usual and normal course of that check of the serial number, what was contained in the rear portion of the vehicle. In our opinion, this was proper under the circumstances of the arrest for the violation of the motor vehicle law and the check of the serial number was not a "mere pretext" to discover what was contained in the rear portion of the Sedacca vehicle. Fortunately, the diligence of the troopers was rewarded by the fact, found by the trial court, that the word "Kool" appeared on the side of a large brown cardboard carton in the rear of the car, which indicated, prima facie, that Sedacca was indeed transporting untaxed cigarettes. This was confirmed by Sedacca upon questioning and later, upon the rather prompt arrival of the tax agents of the Comptroller's office (they arrived within 30 to 45 minutes), Sedacca admitted that he was carrying untaxed cigarettes and did not have the required invoice or bill of lading. The tax agents then arrested Sedacca, searched the vehicle and found the 858 cartons of untaxed cigarettes, which they confiscated.

In *Musgrove v. State,* 1 Md. App. 540, 232 A. 2d 272 (1967), a detective of the Prince George's County Police was assigned to investigate the theft of two motorcycles. From information he had received, he suspected that Musgrove, the appellant in that case, was connected with the theft of the motorcycles. After looking for Musgrove for approximately a month and one-half, he saw him driving a motorcycle out of a parking lot without stopping. The detective then issued a ticket to Musgrove and at the same time proceeded to check the serial number listed on Musgrove's registration card against the serial number on the motorcycle. The detective observed that the serial number was crudely stamped on the crank case and when he questioned Musgrove, it was admitted by Musgrove that he had altered the serial number. Musgrove was convicted of larceny of two motorcycles. The traffic violation, however, was dismissed when the arresting detective did not appear at the traffic hearing. On appeal to the Court of Special Appeals, Musgrove contended that the traffic violation was a mere pretext for the arresting officer to make a search and seizure which he otherwise was

without authority to make. The detective had admitted at the trial that the stopping of Musgrove for the traffic violation gave him an opportunity to inspect the motorcycle. In affirming Musgrove's conviction, the Court of Special Appeals aptly stated:

> "The United States Supreme Court, as well as a number of other courts, has stated that an arrest may not be used as a mere excuse or pretext to search for evidence. [Citing *United States v. Lefkowitz*, 285 U. S. 452, 52 S. Ct. 420, 76 L. Ed. 877 and a number of Federal and state cases.] It is also well established, however, that an arrest for a misdemeanor being committed in the presence of a law enforcement officer authorizes a reasonable search of the arrestee's person and property under his control. *Harris v. U. S.*, 331 U. S. 145; *Stokes v. State*, 1 Md. App. 253, 256; *Braxton v. State*, 234 Md. 1, 6; *Jenkins v. State*, 232 Md. 529, 535; *Knotts v. State*, 237 Md. 417, 421.
>
> "In this case the evidence is that the Appellant was stopped by the officer for a traffic violation committed in the officer's presence. It was the officer's right to insure that the registration card displayed to him by the Appellant indicated that he was properly in possession of the vehicle he was driving. When it became evident that the identity of the vehicle could not be established because of the obliterated serial number on the frame and the apparent tampering with the serial number on the crankcase, the officer was within his rights in requesting the Appellant to accompany him to police headquarters in order to make a proper identification of the vehicle.
>
> "The fact that the officer had been looking for the Appellant for a period of over a month as a result of his suspicion that the Appellant had stolen a motorcycle or that the legitimate stopping of the Appellant afforded him an opportunity to inspect the vehicle does not, in our opinion, alter the legality of his action in this case." (1 Md. App. at 546-47, 232 A. 2d at 276.)

See also our decisions in *Braxton v. State*, 234 Md. 1, 197 A.

2d 841 (1964) and *Cornish v. State,* 215 Md. 64, 137 A. 2d 170 (1957), both of which involved bona fide arrests for traffic violations committed in the presence of the police officer, who, however, suspected that the accused was guilty of more formidable crimes. Judge (now Chief Judge) Hammond, for the Court, stated in *Braxton*:

> "Although a reasonable belief that appellant had committed a felony may not be availed of, it is our view that there may be reliance on the companion rule that a peace officer may make an arrest without a warrant for a misdemeanor which has been or is being committed in his presence, if he has reasonable grounds for belief that the person he arrests committed it. *Price v. State, supra,* and cases cited therein at p. 35 of 227 Md." (234 Md. at 5, 197 A. 2d at 843.)

In *Brown v. State,* 91 So. 2d 175 (Fla. 1956), a deputy sheriff in Florida was on the lookout for Brown's automobile because of a tip he had received. He followed the vehicle and observed that it veered from side to side. After stopping the automobile, Brown admitted he had been drinking and when questioned about the jugs on the rear floor of the car, admitted that he was carrying intoxicating liquor. Brown was convicted of violating the Florida liquor laws and on appeal contended that the search and seizure was unconstitutional. In affirming his conviction, Mr. Justice Thornal, for the Supreme Court of Florida, stated:

> "A search pursuant to a lawful arrest is perfectly legal. Admittedly the officer in this instance had been 'on the look-out' for appellant's automobile because of a 'tip' from a beverage agent. However, this record clearly indicates that the appellant himself invited his arrest and subsequent search by his own conduct in the operation of the motor vehicle. We do not have here a nebulous or 'flimsy' charge of violating traffic laws * * *." (91 So. 2d at 177.)

The Federal cases also support our conclusion that the search and seizure in this case was not unreasonable. See *Cook v.*

*United States,* 346 F. 2d 563 (10th Cir. 1965) ; *Hutcherson v. United States,* 345 F. 2d 964 (D.C. Cir. 1965), *cert. den.* 382 U. S. 894 (1965) ; *Welch v. United States,* 361 F. 2d 214 (10th Cir. 1966), *cert. den.* 385 U. S. 876 (1966) ; *Massey v. United States,* 358 F. 2d 782 (10th Cir. 1966), *cert. den.* 385 U. S. 878 (1966).

Even if it be assumed, for the argument, that Sedacca did not open the car door for Trooper Landbeck or even consent to the opening of the door, this would not, in our opinion, have made the checking of the serial number on the door post of the car illegal. As we have indicated, checking of the serial number is a normal and ordinary police procedure in motor vehicle investigations. This action would not be a search, *per se,* and even if it be deemed to be a search, it was not an unreasonable search. As Circuit Judge Duniway stated, for the United States Court of Appeals for the Ninth Circuit, in *Cotton v. United States,* 371 F. 2d 385, 394 (9th Cir. 1967) :

> "[W]e are of the opinion that, when a policeman or a federal agent having jurisdiction has reasonable cause to believe that a car has been stolen, or has any other legitimate reason to identify a car, he may open a door to check the serial number, or open the hood to check the motor number, and that he need not obtain a warrant before doing so in a case where the car is already otherwise lawfully available to him."

Trooper Landbeck, being lawfully in the position he was in, had the right to look toward the rear portion of the car and, inasmuch as the word "Kool" was plainly visible, to proceed as he did. As was stated in the per curiam opinion of the Supreme Court of the United States in *Harris v. United States,* 390 U. S. 234, 236, 88 S. Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968) :

> "The sole question for our consideration is whether the officer discovered the registration card by means of an illegal search. We hold that he did not. The admissibility of evidence found as a result of a search under the police regulation is not presented by this

case. The precise and detailed findings of the District Court, accepted by the Court of Appeals, were to the effect that the discovery of the card was not the result of a search of the car, but of a measure taken to protect the car while it was in police custody. Nothing in the Fourth Amendment requires the police to obtain a warrant in these narrow circumstances.

"Once the door had lawfully been opened, the registration card, with the name of the robbery victim on it, was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. *Ker v. California*, 374 U. S. 23, 42-43 (1963) ; *United States v. Lee*, 274 U. S. 559 (1927) ; *Hester v. United States*, 265 U. S. 57 (1924)."

In our opinion, the search and seizure in this case was not unreasonable.

> *Judgment of the Court of Special Appeals reversed and case remanded to the Circuit Court for Harford County for distribution to the proper officials of Harford County of the $500 fine presently held in a special account in accordance with the order of June 7, 1966 of the Circuit Court for Harford County, the appellee, Morris Sedacca, to pay the costs in this Court, in the Court of Special Appeals and in the Circuit Court for Harford County.*