UNITED STATES
v.
Charles Francis FRAZIER, Robert Jones, Walter Rodger Webster.

UNITED STATES
v.
Walter Rodger WEBSTER.
Crim. Nos. 28593, 28748.

United States District Court
D. Maryland.
Sept. 30, 1969.

Stephen H. Sachs, U. S. Atty., and Stephen D. Shawe, Asst. U. S. Atty., Baltimore, Md., for the United States.

Harold I. Glaser, Baltimore, Md., for defendants.

1. On February 14, 1969, Webster was found not guilty by a jury in that case. Subsequently, the indictment was dismissed as to Frazier.

HARVEY, District Judge:

On April 16, 1969, the Grand Jury for the District of Maryland returned an indictment (Criminal No. 28593) charging Walter Rodger Webster and two other defendants with various perjury offenses. Webster alone is charged with perjury in Counts 1, 2 and 5; co-defendant Jones is charged with perjury in Count 3, and co-defendant Frazier is charged with perjury in Count 4. According to the indictment, Webster, Frazier and Jones all testified at Webster's trial in this Court in Criminal No. 28404, in which both Webster and Frazier had been charged with unlawful conspiracy and with assisting Frazier's attempt to escape from federal custody.[1]

On April 16, 1969, the same day that Indictment No. 28593 was returned, Judge Watkins signed a bench warrant for the arrest of Webster and fixed bail at $10,000. The next morning agents of the Federal Bureau of Investigation went to Webster's home at 1919 E. Thirty-first Street, Baltimore, Maryland, and arrested this defendant. No search warrant had been obtained. In the course of the arrest, certain papers and other articles were taken from Webster's bedroom, including quantities of substances later identified as heroin and cocaine. Subsequently, on July 29, 1969, the Grand Jury returned another indictment (Criminal No. 28748) charging Webster in four counts with unlawfully purchasing heroin and cocaine and with unlawfully receiving these drugs after importation in violation of 26 U.S.C. § 4704(a) and 21 U.S.C. § 174.

In both of these pending cases, Webster has filed motions to suppress the evidence, claiming that the articles taken from his home on April 17, 1969 without a search warrant were illegally seized under Chimel v. State of California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[2] It is further contended that

2. The other defendants in No. 28593 have joined in the motion filed in that case.

even if *Chimel* does not apply in this case, the search was illegal under earlier decisions of the Supreme Court. A hearing has been held at which various FBI agents testified, and the papers and articles seized were introduced in evidence.

The testimony discloses that on the morning of April 17, 1969, five FBI agents went to Webster's home to arrest him pursuant to the bench warrant signed by Judge Watkins on the previous day. They had no search warrant with them. Agents Milborne, Benedictus and Bonner went to the front door, and Agents Kennedy and Cross stationed themselves at the rear of the house. They arrived at approximately 11:17 A.M., and after ringing the door bell and knocking for several minutes, the three agents at the front door forced their way in, gaining entrance at approximately 11:24 A.M. They were met by Webster who was then descending the stairs dressed in his underwear. The agents identified themselves and told Webster that he was under arrest.[3] Webster asked permission to get dressed, and after the rear door was opened and the two agents stationed there were admitted, three of the agents accompanied Webster to his bedroom.

Once in his room, Webster was told to sit on a chair near a window opposite the entrance. The agents thereupon proceeded to search his room. According to Agent Milborne, they were looking for weapons and evidence that might be used at his perjury trial. As the search proceeded, Webster from time to time was permitted to sit on the bed and use the telephone. In a dresser drawer, the agents found a fully loaded automatic .25 caliber pistol. The same drawer was found to contain also a .32 caliber bullet and several .38 caliber bullets. On the floor in plain view were a green valise and a brown leather carrying case. The green valise was zippered open by the agents, and although various articles were examined, nothing pertinent to these prosecutions was taken. On top of the dresser were located plastic capsules and envelopes containing substances later identified as heroin. A strainer was recovered on the floor next to the dresser. In a closet across the room from the chair in which Webster was sitting two letters were found from Frazier to Webster dated October 11 and October 18, 1968, and also an automobile repair bill for a 1960 Buick. In an open wall safe which was next to Webster's chair the agents came upon another automobile repair bill for a 1963 Cadillac, which had been an exhibit in the trial of Webster in No. 28404.

During the search the agents unsuccessfully tried to open the brown carrying case which was locked. They then ordered Webster to open it. After at first refusing, he agreed under protest to open the combination lock. In the carrying case were found, *inter alia,* powdery substances, later identified as heroin and cocaine. When the search of Webster's room and clothing had been completed, he was permitted to get dressed, and the agents left the house at approximately 12:15 P.M. with the defendant and the articles seized. A contemporaneous search of other portions of the house by the two agents downstairs turned up nothing that was seized by the agents.

The government seeks to use as evidence in the trial of the perjury case the two letters and the repair bill. In the trial of the narcotics case, the government would attempt to introduce in evidence the strainer, the heroin and the cocaine which were taken during the search.

A threshold question presented by these motions is whether Chimel v. State of California, *supra,* is to be given retroactive application. In that case, decided by the Supreme Court on June 23, 1969, the Court laid down new rules limiting permissible searches incident to an arrest. The Court said the following (395

---

3. No claim has been made that the arrest was illegal.

U.S. at pages 762–763, 89 S.Ct. at page 2040):

"A similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent. When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching rooms other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less."

The facts here indicate that under the *Chimel* standards some of the articles taken from Webster's room were legally seized and others were not. However, it is not necessary to consider the facts here in the light of *Chimel*, as this Court has concluded that that case should not be retroactively applied to the search of Webster's bedroom which occurred on April 17, 1969. In Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed. 2d 728 (1969) and Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969), which were both decided the same day as *Chimel,* the Supreme Court expressly declined to determine whether *Chimel* should be applied retroactively. In both cases, the Supreme Court in finding the search and seizures to be improper applied the constitutional standards prevailing before *Chimel,* as set forth in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

The question of the retroactivity of newly enunciated constitutional principles is a troublesome one. Not only must a court determine whether a new rule should be retrospectively or prospectively applied, but further questions present themselves as to the stage of the proceedings at which such application is to be directed. For example, in the pending case, no problem of the retroactive application of *Chimel* would be presented if the critical date were held to be the trial date in both of these cases, since the cases have not as yet come on for trial. However, the issue is very much alive if the critical date is held to be the date of the search which occurred before the *Chimel* decision.

The recent Supreme Court decision in Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), is very much in point here. That case posed the question whether the Supreme Court's decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), should be applied retroactively. In the *Katz* case, the Court held that every electronic eavesdropping upon private conversations is a search and seizure and that such eavesdropping can comply with constitutional seizure standards only when authorized by a judicial officer upon a showing of probable cause and under precise limitations and ap-

propriate safeguards. In *Desist,* the Court noted that the eavesdropping in that case was not carried out pursuant to a warrant and that the convictions would have to be reversed ·if *Katz* were to be applied to electronic surveillance conducted before the date it was decided. After a careful review of the various factors that pertain to a determination whether a new constitutional rule should be given retroactive application, the Supreme Court in *Desist* held that *Katz* should be applied only to cases in which the prosecution sought to introduce the fruits of electronic surveillance *conducted* after December 18, 1967 (the date of the *Katz* decision). Since the eavesdropping in the *Desist* case occurred before that date and was found to be consistent with the pre-*Katz* decisions of the Court, the convictions in *Desist* were affirmed.

■ The same reasoning which supports the Supreme Court's decision in *Desist* likewise applies here. In Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), the Supreme Court listed the criteria for resolving a question of retroactivity of a new constitutional rule affecting a criminal trial as "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." The cases that require the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action. Linkletter v. Walker, 381 U.S. 618, 619, 636, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Here, as in *Desist,* the purpose to be served by the new constitutional rule would not be advanced if such rule were given retroactive application. Any misconduct of the FBI agents here had already occurred before the new constitutional rule was enunciated, and applying the rule retroactively could have no deterrent value. Also here, as in *Desist,* the second and third factors mentioned in *Stovall* militate in favor of applying

*Katz* prospectively. The Supreme Court in *Chimel* indicated that such decision represented a clear break from the principles of *Harris* and *Rabinowitz.* In conducting their search in this case, the agents were fully justified in relying on those cases which had been decided in 1947 and 1950, respectively. Furthermore, numerous previous convictions in state and federal courts undoubtedly were the result of searches and seizures which would be now invalidated if weighed in terms of the *Chimel* standards. A considerable burden on the administration of justice would result from a holding that *Chimel* was to be retroactively applied to any search occurring before the date of that decision. For the reasons stated in *Desist,* this Court holds that *Chimel* is to be applied only to cases in which the prosecution seeks to introduce the fruits of a search and seizure occurring after June 23, 1969.

￣The same result has been reached by the United States District Court for the Southern District of New York in Prater v. Mancusi (S.D.N.Y. July 21, 1969). A decision of the Court of Appeals of Maryland is to the same effect, Scott v. State of Maryland, 7 Md.App. 505, 256 A.2d 384 (August 12, 1969), as is a decision of the California Court of Appeals. People v. Castillo, 80 Cal.Rptr. 211, 219 (decided July 2, 1969).

It is clear from Von Cleef v. New Jersey, *supra,* and Shipley v. California, *supra,* that the constitutional standards to be applied to a search made incident to a valid arrest occurring before *Chimel* are those stated in Harris v. United States, *supra,* and United States v. Rabinowitz, *supra.* In *Harris,* police officers arrested the defendant on the basis of a warrant issued because of his alleged involvement with the cashing and interstate transportation of a forged check. Following his arrest which occurred in the living room of his 4-room apartment, police officers undertook a search of the entire apartment. Documents were found which were used to secure Harris's conviction of a violation of selective service law. The Supreme Court sustained

the search as one made incident to a valid arrest.

In *Rabinowitz*, federal authorities secured a warrant for the defendant's arrest for dealing in stamps bearing forged over-prints. The arrest occurred at the defendant's 1-room business office at which time officers searched the defendant's desk, safe and file cabinets for approximately an hour and a half. The Supreme Court rejected the defendant's contention that stamps found during the search and admitted into evidence at the trial had been illegally seized. In the *Chimel* case, *supra*, 395 U.S. at page 760, 89 S.Ct. at page 2038, the Court said that *Rabinowitz* "has come to stand for the proposition, *inter alia*, that a warrantless search 'incident to a lawful arrest' may generally extend to the area that is considered to be in the 'possession' or under the 'control' of the person arrested." In discussing the rule allowing searches contemporaneous with a lawful arrest, the Court in Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964) said that such a search "is justified, for example, by the need [of arresting officers] to seize weapons and other things which might be used to assault an officer or effect an escape as well as by the need to prevent the destruction of evidence of the crime —things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control."

If the facts relating to the search in *Harris* are compared with those in *Rabinowitz*, it is immediately apparent that the *Harris* rule is the broader of the two. In *Harris*, the search of an entire four-room apartment was upheld while in *Rabinowitz* the Court approved the search of but a one-room office.[4] *Harris*

would permit extension of the area within the possession or control of the person arrested to more than one room. *Rabinowitz*, if limited to its facts would confine such area to a single room. However, it is not necessary in this case (in which pre-*Chimel* law is to be applied) to decide whether the rule of the *Harris* case has been narrowed by *Rabinowitz* and other cases decided before *Chimel*. Solely for the purposes of this case, this Court will apply the *Rabinowitz* test as strictly limited to its facts and will determine whether the search here was confined to an area within a single room that might be considered to be in the possession or under the control of Webster. It is not necessary under the facts here to decide whether pre-*Chimel* law would permit searches of rooms other than the one where the arrest occurred or to which the defendant of his own volition went after such arrest.

Applying such a test, this Court concludes that all the articles and substances which the government seeks to use as evidence and which were seized by the agents on April 17, 1969 in Webster's bedroom were lawfully taken incident to Webster's arrest, except for the items contained in the locked brown carrying case.[5] At the hearing, the government conceded that it would not be entitled to introduce in evidence the heroin and cocaine taken from the locked carrying case.

All the other articles and papers seized were effectively within Webster's possession or control as that term has been construed by *Rabinowitz*. During the search Webster was seated some 4 or 5 feet from the dresser where the agents found a pistol, bullets and narcotics. He arose several times to use the telephone located beside the bed. Immediately next

---

4. In discussing the pre-*Chimel* law in Shipley v. California, *supra*, the Supreme Court said the following in its *per curiam* opinion (395 U.S. at 820, 89 S.Ct. at 2054):

"At the very most, police officers have been permitted to search a four-room apartment in which the arrest took

place. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399."

5. As the government does not seek to use as evidence anything contained in the green valise, it is not necessary to decide if the agents had the right to zip open this suitcase and seize its contents.

to the chair where Webster was seated was located an open wall safe in which an automobile repair bill was found. In searching the closet in which were located Webster's clothing and shoes, the two letters from Frazier were found as was the other automobile repair bill. All of these items were within the control of Webster under the narrow construction of *Rabinowitz* being applied for the purposes of this case.

The purpose of the rule permitting a search incident to a valid arrest is highlighted by the facts of this case. According to the testimony of Agent Milborne, Webster was known as a dangerous individual, suspected of having committed at least one homicide. The agents' search did in fact uncover a loaded pistol located in a drawer that could easily have been reached had Webster lunged forward from his chair or while moving across the room to use the telephone. In the same drawer were located bullets of different caliber than that of the pistol that was found, suggesting to the agents that other weapons might be located in the room and giving them good reason to continue to search the room.[6]

■ The fact that Webster was first informed of his arrest as he was descending the front stairs does not change the result here. He was then in his underwear, and it was *his* request that he be permitted to return to his bedroom and get dressed. Once the agents went with him to his bedroom, they were entitled to search for weapons or evidence located in his clothing or otherwise under his possession or control in such room. Had Webster been fully clothed when arrested and had he then stated that he was ready to go with the arresting officers, there would have been a serious question

under a strict construction of *Rabinowitz* whether the agents could have gone to his room in his absence and searched it.

■ Defendant argues that the principal purpose of the agents in entering the house was to make a general search and that since general searches are unreasonable and unlawful, the motions to suppress should be granted as to all the evidence seized. The proof here does not support this contention. The arrest and search, including the time required for Webster to get dressed, took no longer than 50 minutes. There was no combing of Webster's house from top to bottom and no wholesale seizure of large quantities of articles, as in the *Von Cleef* case.[7] What the evidence shows at most is that the agents had a dual purpose. First and primarily, they intended to arrest Webster and make a reasonable search of his person and of the area under his immediate control. This area came to be his bedroom when he asked permission to go there to dress. Secondly, they intended to search certain other parts of Webster's house. Had the latter purpose stood alone and had such a search uncovered evidence which the government sought to use in the prosecution of Webster in either of the cases pending in this Court, a different question indeed would be presented. But where there is a dual purpose and the primary one is valid while the secondary one is not, the latter does not invalidate the lawfulness of a search conducted pursuant to such valid purpose. See United States v. Lee, 308 F.2d 715, 717 (4th Cir. 1962); State v. Sedacca, 252 Md. 207, 221–222, 249 A.2d 456 (1969); Williams v. State, 6 Md.App. 511, 252 A.2d 262 (1969); Musgrove v. State, 1 Md.App. 540, 546–547, 232 A.2d 272 (1967). In the *Lee* case, following exe-

---

6. No other weapon was in fact found.

7. In *Von Cleef*, petitioner was arrested on the third floor of a 16-room house. A

warrantless search was undertaken by several policemen for about three hours and several thousand papers, publications and other items were seized.

cution of the arrest warrant in the living room, one of the officers proceeded to the rear door of the house to admit another officer. On this mission, he observed incriminating evidence. In upholding the search, Judge Haynsworth said the following, 308 F.2d at page 717:

"If Vassar went to the rear of the house for the dual purpose of admitting Blake and of searching to the extent that he could while serving his first purpose, the search was plainly not unreasonable."

■ The fact that the agents here could not after entering Webster's house to arrest him have undertaken a general search of the entire house does not mean that they could not seize evidence they discovered in the course of a lawful search of his bedroom. There is nothing in the evidence introduced at the hearing on this motion to indicate that Webster's arrest was a sham or pretext used by the agents for the purpose of searching Webster's house from top to bottom.[8] This arrest occurred following indictment by a federal grand jury and the issuance of a bench warrant by a judge of this Court.

For the reasons stated, the motions to suppress are granted with reference to the evidence contained in the brown leather carrying case seized by agents on April 17, 1969 in the bedroom of defendant Webster. The motions to suppress are denied as to all the other evidence taken from such bedroom on that day which the government intends to offer in evidence at trials in either of these two cases.

Counsel are directed to prepare and submit an appropriate order.

8. Where the arrest is only a sham or a front being used as an excuse for making a search, the arrest itself and the ensuing search are illegal. Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961).