752 A.2d 1250

**Raymond Davis WILSON a/k/a Raymond Junior Wilson**

v.

**STATE of Maryland.**

**No. 1597, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 7, 2000.

512

514

Martha Weisheit, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MOYLAN, EYLER and SONNER, JJ.

MOYLAN, Judge.

The appellant, Raymond Davis Wilson, challenges his convictions by a Montgomery County jury, presided over by Judge Martha G. Kavanaugh, of first-degree rape, two counts of a first-degree sexual offense (one involving sodomy and the other, fellatio), first-degree burglary, and robbery. On appeal, he presents the following questions for resolution:

1. Was the evidence legally sufficient to prove the penetration required for both the rape and one of the first-degree sexual assault convictions?

2. Did the trial court err in refusing to compel the production of validation studies of the DNA evidence conducted by the Cellmark Laboratory?

3. Did the trial court err in denying the appellant's motion to suppress evidence obtained following his pretextual arrest on an outstanding warrant for a traffic violation?

4. Was the 1991 warrant for the seizure of the appellant's blood supported by probable cause?

5. Was it a violation of the appellant's Fourth Amendment rights to examine blood seized from him pursuant to a warrant in an earlier unrelated case without a second warrant?

## The Factual Background

In the early morning hours of December 12, 1997, seventy-six-year-old Jill Livesey awoke in her Potomac, Maryland home to the sight of a stranger standing in her bedroom doorway. The intruder, wearing a mask, approached her, pushed her back onto her bed, and attempted to hold her down. Ms. Livesey struck her assailant and scratched him on his face, but he nonetheless succeeded in pulling off her pajamas. The intruder then raped Ms. Livesey "back and front many times." He also forced the victim to perform fellatio upon him. In the course of the fellatio, he suddenly stopped and demanded money. Ms. Livesey gave the man four $100 bills that she kept in her dresser. He then fled the scene.

Later that day, the victim was taken to Shady Grove Hospital where she was examined by Susan Boch, a nurse practitioner. Ms. Boch took a report from the victim in which the victim stated:

He took his pants down and tried to put his penis in the front of me and then the back of me, and when I wasn't— when he wasn't so successful, he put that wretched penis in my mouth.

The victim also stated that she "honestly didn't know" whether her attacker had penetrated her vagina and anus. Ms. Boch took swabs of the victim's vaginal and rectal areas and photographed both. She also took fingernail clippings.

Several other witnesses were also interviewed regarding the crime. Brian Schwartzback, who was living in an apartment in Ms. Livesey's barn, testified that he knew the appellant and that he saw the appellant several days after the incident. Schwartzback recalled that at that time, the appellant had his hand wrapped in a gauze bandage. A taxicab driver testified that in the early morning hours of December 12, he picked up an individual in Tobeytown (a neighboring town to Potomac) and the individual paid for his fare with a $100 bill. A tracking dog subsequently followed a trail from Ms. Livesey's residence to the Tobeytown area.

Tammy Mindick, an acquaintance of the appellant, testified that at 5:30 a.m. on December 12, the appellant unexpectedly arrived at her home by taxicab. Ms. Mindick noticed scratches on the appellant's face. When the detectives arrested the appellant on December 22, they also noticed that he had injuries to his hands and a healed scratch under his left eye. The detectives took photographs of the appellant as well as hair and saliva samples.

## The Element of Penetration:
## Rape and Sodomy

The appellant does not challenge the legal sufficiency of the evidence to support his convictions for robbery, first-degree burglary, and the first-degree sexual offense involving fellatio. He challenges only his convictions for 1) rape and 2) the first-degree sexual offense involving sodomy. His claim is that the State's evidence was not legally sufficient to show the penetration that is a required element of both crimes.

The appellant argues that Ms. Livesey's conclusory testimony that the appellant "raped me front and back many times" is not in itself enough to prove that penetration did, in fact, occur. The appellant focuses, moreover, on the victim's admission to the examining nurse that she "honestly didn't know" whether the appellant had made vaginal or anal penetration.

The appellant is, of course, correct in his assertion that penetration is a required element of both first-degree rape under Md.Code Ann., art. 27 § 462, and of certain first-degree sexual offenses (sodomy or anal intercourse) under Md.Code Ann., art. 27 § 464. As to rape, see *Smith v. State*, 224 Md. 509, 168 A.2d 356 (1961) and *Robert v. State*, 220 Md. 159, 151 A.2d 737 (1959). As to sodomy or anal intercourse, see *Bradbury v. State*, 233 Md. 421, 423, 197 A.2d 126 (1964) and *Canter v. State*, 224 Md. 483, 485, 168 A.2d 384 (1961). *And see* Md. Ann.Code, art. 27 § 461(g) ("Penetration, however slight, is evidence of vaginal intercourse.") and § 461(e) ("Penetration, however slight, is evidence of anal intercourse.").

We turn our attention first to the element of penetration that was always a requirement of common law rape and is still, unchanged, a requirement of art. 27, § 462. In terms of its basic elements, the 1976 statute is simply declarative of the common law felony of rape. Although § 461(g) may tell us that "[p]enetration, however slight, is evidence of vaginal intercourse," it neglects the arcane, but sometimes critical, follow-up question "Penetration of what?" Especially in rape cases involving very young victims, the evidence of penetration is frequently very problematic. The critical difference between consummated rape and attempted rape may turn on overlooked nuances of the genital geography of the human female.

*Craig v. State,* 214 Md. 546, 136 A.2d 243 (1957), was the first Maryland appellate opinion to examine the required element of penetration in this anatomical context of distinguishing the vulva generally from the vagina specifically as the locus of required penetration. It pointed out, 214 Md. at 547, 136 A.2d 243:

> Penetration, however slight, will sustain a conviction for the same, but the proof thereof must sustain a res in re; that is, an actual entrance of the sexual organ of the male within the labia (majora) of the pudendum (the external folds of the vulva) of the female organ, and nothing less will suffice.

In *Kackley v. State,* 63 Md.App. 532, 537, 493 A.2d 364 (1985), we explained that "penetration into either the labia minora or the vagina is not required; invasion of the labia majora, *however slight,* is sufficient to establish penetration." (Emphasis supplied).

The external female genitalia are covered by two folds of fatty or adipose tissue known as the *labia majora,* the major or outer lips. That is the critical locus for the legally significant element of penetration. When the *labia majora* are pushed aside, access is permitted into the pudenda or vulva generally. Within that vulvar vestibule, in a more anterior position, is the clitoris or external opening of the female urethra, which is surrounded by two smaller fatty or adipose

folds, known as the *labia minora*—the smaller or inner lips. Also within the vulva or pudenda but in a more posterior position is the opening or orifice of the vaginal canal itself. The vaginal canal is the sheath that connects the vulva with the cervix or opening of the uterus. In a virginal female, the opening to the vaginal canal is covered by a thin membrane known as the hymen or maidenhead, unless that membrane has somehow been ruptured.

█ It is a well-settled principle of rape law that the penetration that is required is penetration only of the *labia majora*. No penetration of or entry into the vaginal canal itself is now or has ever been required. As *Craig v. State* pointed out, 214 Md. at 549, 136 A.2d 243, "[T]here may, of course, be penetration without the rupture of the hymen." That basic principle was not changed by the 1976 statute, which did not undertake to alter in any way the common law meaning or definition of rape. The use of the term "vaginal intercourse" by §§ 462 and 463 does not require any penetration, even slight penetration, into the literal vaginal canal itself. The penetration required remains simply the vulvar penetration that has always been required to prove common law rape. Section 461(g) stands for this proposition as it states that " 'vaginal intercourse' has its ordinary meaning of genital copulation." [1]

---

1. The contention inevitably will arise that when the Legislature, in §§ 462 and 463, used the term "vaginal intercourse" to define, respectively, first-degree and second-degree rape, it thereby intended to overrule cases such as *Craig v. State* and *Kackley v. State* and to add an additional or slightly incremental penetration requirement that goes beyond the requirement of the common law. A reading of the phrase "vaginal intercourse" in the context of the Sexual Offenses subtitle generally, however, will not support any such interpretation.

The clear purpose of the phrase "vaginal intercourse" in the 1976 statute was not to distinguish vaginal intercourse from vulvar intercourse. That well settled issue was not before the Legislature and the new statute did not presume to tinker with it. The use of the phrase "vaginal intercourse," rather, was to distinguish the well understood act of sexual intercourse between a man and a woman from such other "sexual acts," defined by § 461(e), as cunnilingus, fellatio, analingus, and anal intercourse. As the Legislature sought to maintain the distinc-

■■■■ The appellant's challenge in this case goes not to the substantive law of penetration but to the State's evidence with respect to penetration. We hold that the testimony from the victim was itself enough to generate a *prima facie* case of

tion between traditional Rape, on the one hand, and the new Sexual Offenses, on the other hand, it employed the term "vaginal intercourse" as the distinguishing factor. Rape included "vaginal intercourse," §§ 462 and 463. Section 461(e)'s definition of a sexual act, by contrast, expressly stated that the term "does not include vaginal intercourse."

As the Legislature groped for a precise noun or noun phrase to express its intended distinction, it wandered, probably inadvertently, into an ancient linguistic quagmire. The common law crime of rape was concerned exclusively with the act of sexual intercourse between a man and a woman. Although it was universally understood, the act was variously referred to by a number of essentially, if not quite literally, synonymous terms such as "sexual intercourse," "carnal knowledge," "coitus," and "copulation." Everybody knew what was meant but the euphemistic employment of Biblical phraseology and of trisyllabic and tetrasyllabic Latin was linguistically treacherous. Both "carnal knowledge" and "copulation" said too little, for carnal knowledge might well involve various forms of sexual intimacy and copulation means a sexual coupling that arguably could involve various modalities. "Coitus," on the other hand, said too much, for it literally means "the act of conveying the male semen into the female reproductive tract involving insertion of the penis into the vagina orifice followed by ejaculation." *Webster's Third New International Dictionary, Unabridged* (1969), whereas the law of rape has never required ejaculation or the emission of semen. One almost longs for the simplicity of a Saxon monosyllable.

When the Legislature settled on the term "vaginal intercourse" to distinguish rape from the sexual offenses, it unwittingly raised a recurring linguistic problem. It is the familiar problem of the "umbrella term" which embraces two or more connotations and the attendant problem of determining which connotation is intended on a given occasion. With respect to the term "vaginal intercourse," the nub of the difficulty is that the adjective "vaginal" has a broader meaning for the layman, the lawyer, and the legislator than it does for the gynecologist.

The Legislature clearly used the noun "vagina" and the adjective "vaginal" to refer to the female genitalia generally. Its use of the term "vaginal intercourse" connoted what is commonly understood as sexual intercourse between a man and a woman. The Legislature was not focusing on the anatomical nuance that a penis might enter by a fraction of a centimeter into the female genitalia generally before it came into contact with the literal vagina itself, to wit, with the external orifice of the vaginal canal. The term "vaginal intercourse" was not intended to suggest a second and sequential penetration into the literal vagina following the initial penetration into the vulvar vestibule. *Craig v. State* and *Kackley v. State* remain good law.

penetration. Ms. Livesey testified that she had been raped "back and front many times." When asked to elaborate, she explained, "Well, I mean the front part of me, my vagina, and the back, the rectum." The victim's description of what occurred to her was sufficient to establish, *prima facie*, that penetration occurred. As we said in *Simms v. State*, 52 Md.App. 448, 453, 449 A.2d 1196 (1982),

it is clear that *the victim need not go into sordid detail to effectively establish that penetration occurred during the course of a sexual assault.* Where the key to the prosecutor's case rests with the victim's testimony, the courts are normally satisfied with descriptions which, in light of all the surrounding facts, provide a reasonable basis from which to infer that penetration has occurred.

(Emphasis supplied).

■ The appellant seeks to counteract that testimony by Ms. Livesey with her admission to the examining nurse that she "honestly didn't know" whether the appellant had made vaginal or anal penetration. That arguable equivocation on her part, her trial testimony versus her out-of-court declaration, goes only to the weight of Ms. Livesey's trial testimony and not to its admissibility. It concerns only the burden of persuasion and not the burden of production. The issue of legal sufficiency, of course, has nothing to do with the burden of persuasion.

■ Proof of penetration, moreover, need not rely on the observation and the testimony of a victim but may be established by extrinsic medical evidence. In many cases where the victim is a young child, medical testimony is the only way of establishing the element of penetration. We observed in *Kackley* that "[t]he proof [of penetration] may be supplied by medical evidence, by the testimony of the victim, or by a combination of both." 63 Md.App. at 537, 493 A.2d 364 (internal citations omitted). In *Kackley* itself, the State introduced, along with the eleven-year-old victim's testimony, testimony from the child's examining physician that the victim had "superficial abrasions on the posterior aspects of the vaginal

opening" and fresh blood on the child's underwear. 63 Md. App. at 538, 493 A.2d 364. Such evidence supported the establishment of penetration.

In *Smith v. State*, 6 Md.App. 581, 585–86, 252 A.2d 277 (1969), evidence of penetration of the four-year-old victim was sufficient where "medical evidence showed that the vagina of the victim was split by the insertion of some object, which could have been a penis, and that spermatozoa were all around the area, and probably within the vagina as well." In *Edmondson v. State*, 230 Md. 66, 68–69, 185 A.2d 497 (1962), evidence of the penetration of a mentally disabled adult woman was sufficient to prove rape when there was "laceration and bleeding in the vaginal region." *See also Young v. State*, 228 Md. 173, 175, 179 A.2d 340 (1962); *Shorey v. State*, 227 Md. 385, 388, 177 A.2d 245 (1962). In *Moore v. State*, 23 Md.App. 540, 551, 329 A.2d 48 (1974), we explained that "[w]e know of no rule of law that requires a rape victim to observe the entry of a male organ into her body."

The State's proof in this case does not depend exclusively on the perception or the testimonial narration of the victim-witness. Susan Boch, the nurse practitioner who examined Ms. Livesey immediately following the incident, took numerous pictures of the victim's vaginal and anal areas. At trial, Ms. Boch explained to the jury that during the examination she applied blue dye to the victim in order to highlight injuries to the tissue. She then pointed out to the jury those injuries as evidence of penile penetration. She concluded by offering her opinion that the injuries to Ms. Livesey's vagina and anus were consistent with the description by Ms. Livesey that she had been "raped back and front, many times." [2]

We hold that the evidence of penetration was legally sufficient to support the appellant's conviction for the crime of rape. There is no distinction with respect to the legal sufficiency of the evidence of penetration in the sexual offense case

---

**2.** No objection was made to this testimony and no appellate contention has been raised with respect to it. No question as to its admissibility is before us.

involving sodomy or anal intercourse. The testimony of Ms. Livesey and the medical testimony, recounted by Susan Boch, both establish a clear *prima facie* case in that regard.

## Validation Studies of Testing Techniques
## for DNA Evidence

Key trial evidence establishing the criminal agency of the appellant consisted of DNA test results. Two employees from the Cellmark Laboratory testified on behalf of the State. Paula Yates, the forensic supervisor at Cellmark, testified as an expert witness in DNA testing. Julie Kempton, a staff employee at Cellmark at all relevant times, also testified as a DNA testing expert.

Ms. Yates explained that she had tested both fingernail scrapings and rectal swabs obtained from the victim and compared those samples with blood samples taken from the appellant. She used a technique known as PCR testing. Ms. Yates concluded that the appellant, who is an African–American, could not be excluded as a source from either the fingernail scrapings or the rectal swabs, which produced trace amounts of sperm. She further testified that approximately 99.99 per cent of the African–American population could be excluded as a potential source.

Ms. Kempton testified that she performed a different type of test on the samples called a Short Tandem Repeat Test. Based on the results of her tests, coupled with the results of Ms. Yates's tests, Ms. Kempton concluded that the appellant could not be excluded as a potential source and that the frequency of the profile was 1 in every 50 million individuals in the African–American population. In the Caucasian population, the frequency of the profile would be 1 in every 9.5 billion; in the Hispanic population, 1 in every 1.6 billion.

The defense sought to counteract the impact of the DNA evidence by casting doubt on the procedural validity of Cellmark's testing techniques. Prior to trial, the court held a hearing on defense counsel's Motion to Compel Discovery. Specifically, the defense sought to obtain information concern-

ing "validation studies," studies conducted by Cellmark Laboratory to ensure the reliability and accuracy of the genetic testing done in the appellant's case. At the hearing, the defense called Dr. Theodore Kessis of the Johns Hopkins University, who testified as an expert in molecular biology and DNA testing. He initially thought that validation studies were required to guarantee the accuracy of the testing. Dr. Kessis explained that Cellmark offered to provide him with either of two alternatives. First, Cellmark offered to provide Dr. Kessis with the validation studies it had performed in the instant case for a fee of $4,000. In the alternative, Cellmark offered to provide Dr. Kessis an opportunity to visit the laboratory and view the files himself for a fee of $200 per hour. Defense counsel, a public defender, argued that the failure to provide such evidence to the appellant unless the defense paid the required price effectively penalized the appellant because of his indigence.

At that hearing before Judge Kavanaugh, the State responded in several ways. Its first response was to establish that if the "controls" used in the course of the DNA testing in this case were shown to have been working properly, validation studies become unnecessary. The State introduced the testimony of Dr. Jennifer Reynolds, Director of the Identity Laboratory at Cellmark, who was qualified as an expert in the application of forensic DNA testing. Dr. Reynolds explained for the court in detail what a validation study is and how it is conducted. She explained that defense counsel's requests were "excessive" because 1) the controls were shown to have been working properly [3] and 2) validation studies were actually

---

**3.** At trial, the defense did not call Dr. Kessis to testify. The reason for this was revealed in the course of the subsequent motion for a new trial. Defense counsel explained to the court that Dr. Kessis's further review confirmed the conclusion of Dr. Reynolds, the State's expert witness, that validation studies were unnecessary because the controls had, indeed, worked properly. On the first set of photographs which were provided to the defense in discovery, the "control dots" had apparently not been clearly visible. In the next set, however—the first generation photographs—Dr. Kessis noted that the control dots were clearly visible. Defense counsel explained to the court that after Dr. Kessis

performed in this case which showed that all tests had been performed properly.

Rather than take Dr. Reynolds's expert opinion as fact, however, the defense then decided that it wanted to make its own review of Cellmark's validation studies. The critical question before the court became that of who would pay for such a review. Cellmark was willing to make and provide copies of the extensive validation studies themselves to the defense at a cost of $4,000. In the alternative, Cellmark was willing for a defense expert to visit its laboratory and review the validation records directly at a cost of $200 per hour. Judge Kavanaugh was willing for the defense to employ either modality it chose in that regard, but she was not willing to impose the cost of such a defense investigation on the State.

At the conclusion of the hearing, the following occurred:

The Court: ... *I am not going to order that they provide them to you for $4,000.*

[Defense Counsel]: Well, I don't know whether the Public Defender is going to pay the $4,000 to get them.

The Court: Right. Well, I mean *your witness can go over there and look them over.* I mean ... he can go through those, and prove them, and see if there is anything there.

[Defense Counsel]: *Very well.*

The Court: All right. So we will do it that way. I think—hopefully he can read pretty quickly and get to the heart of that.

(Emphasis supplied).

The appellant now complains that Judge Kavanaugh's ruling substantially impaired his ability to present a defense. Specifically, he argues that "in light of the refusal of the Office of the Public Defender to pay the $4,000 required for those materials, the judge's ruling was tantamount to a denial of the defense request for discovery on grounds of indigence."

---

had reviewed that second set of photographs, "he would not be able to give the opinion that he had already given in testimony before the court [at the discovery hearing]."

■ In the first place, the issue is not preserved for appellate review. Immediately after Judge Kavanaugh explained that Dr. Kessis could visit Cellmark and examine the validation studies in person, defense counsel responded, "Very well." There was no further comment from the defense. The appellant did not note a continuing objection for the record or give any other indication that he disagreed with the court's ultimate ruling. As the Court of Appeals explained in *Gilliam v. State,* 331 Md. 651, 691, 629 A.2d 685 (1993), "As Gilliam did not object to the course of action proposed by the prosecution and taken by the court, and apparently indicated his agreement with it, he cannot now be heard to complain that the trial court's action was wrong." *See also* Maryland Rule 8–131(a); *White v. State,* 324 Md. 626, 640, 598 A.2d 187 (1991). The same result follows here.

■ Even if the issue had been preserved for our review, however, we would not be persuaded on the merits of the contention. "[T]he supplying of expert pretrial services to indigent defendants in criminal cases at public expense is a matter within the sound discretion of the trial court." *Collins v. State,* 14 Md.App. 674, 679, 288 A.2d 221 (1972). *See also Byrd v. State,* 16 Md.App. 391, 394, 297 A.2d 312 (1972); *Swanson v. State,* 9 Md.App. 594, 596–602, 267 A.2d 270 (1970). We perceive no abuse of discretion.

### The Adjective "Pretextual"
### Is Not Pejorative

The appellant contends that Judge Kavanaugh failed to suppress evidence seized from him as a result of an allegedly pretextual arrest on December 22, 1997. We can immediately narrow the focus of the contention. In making his complaint about alleged police misconduct, the appellant complains that the arresting officers 1) unconstitutionally seized hair and saliva samples from him, 2) held him for an undue length of time and failed to give him *Miranda* warnings before questioning him, and 3) unconstitutionally photographed him. The quick answer to two of these alleged abuses is 1) that no hair

or saliva samples were introduced into evidence and 2) that no statements taken from the appellant were introduced into evidence. What earthly difference does non-suppression make when the non-suppressed items are never offered in evidence? Several photographs of the appellant were introduced, however, and we shall, therefore, deal with the subject of the allegedly pretextual arrest.

Based on a general description of her attacker given to the police by the victim as well as on interviews with other individuals, the police arrested the appellant on December 22. Detective Edward Golian made the arrest on an outstanding traffic warrant. Following the arrest, the appellant was transported to police headquarters for an interview. Detective Golian readily admitted that the appellant's apprehension on the outstanding traffic warrant was pretextual in the sense of being opportunistic. Detective Golian acknowledged that he knew at the time he effected the arrest that the appellant was a suspect in a rape that had recently occurred in the area.

Once at police headquarters, the appellant was interviewed by Detectives David Anderson and Paula Hamill. He was questioned about the Livesey rape. During the appellant's trial, both detectives admitted that it was their intention to arrest the appellant on the outstanding traffic warrant "in order to look at him to see if he had any observable injuries" in light of the fact that Ms. Livesey stated that she had attempted to fight off her attacker. Both detectives admitted that it was not "standard procedure" to interview a suspect in an unrelated case when that person had been arrested on a traffic warrant. Rather, the person arrested is usually brought immediately before a commissioner.

According to the appellant, given that he was arrested only for an outstanding traffic warrant, he should have been immediately taken to the commissioner. Thus, all evidence seized during that encounter with the police was in violation of his Fourth Amendment rights. In this regard, however, the appellant weaves for himself a much tighter net of Fourth Amendment protection than that woven by James Madison

and the other framers of the Amendment or by the Supreme Court in the intervening centuries.

*Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), established unequivocally that as long as the police have, objectively speaking, a legitimate reason for making either a *Terry*-stop or an arrest (with or without a warrant), the fact that they also have, subjectively speaking, an additional or more compelling motivation to make the stop or the arrest is immaterial. In this case, the appellant does not question that there was an outstanding arrest warrant for him for a traffic infraction. Objectively speaking, the police were entitled to arrest him on that warrant and to bring him to the station house. Instead of commending the police for their candor in acknowledging their dual and opportunistic purpose, the appellant seeks to punish them for it with the sanction of the Exclusionary Rule.

In the context of using a traffic-related arrest warrant or a traffic-related warrantless stop as an opportunity to accomplish a dual purpose, Maryland actually anticipated the Supreme Court by almost three decades. In *State v. Sedacca,* 252 Md. 207, 249 A.2d 456 (1969), police officers observed Sedacca's car while parked and unattended, and the officers suspected that the vehicle might be carrying untaxed cigarettes. The officers waited for Sedacca to return to his vehicle and then they followed him. When Sedacca failed to stop for a stop sign the officers pulled him over, arrested him for the traffic violation, and searched his vehicle. The Court of Appeals determined that the search of Sedacca's vehicle was not in violation of his Fourth Amendment rights. Judge Barnes, writing for the Court, explained:

> The trial court found that *the trooper* "who did the checking admitted to the *additional motive* that the opening of the car might reveal the contents in the rear." (Emphasis supplied). The trooper who checked the serial number on the door had *two motives,* one to make a bona fide and routine check of the serial number, the other to ascertain if possible in the usual and normal course of that check of the serial number, what was contained in the rear portion of the

vehicle. In our opinion, this was proper under the circumstances of the arrest for the violation of the motor vehicle law and the check of the serial number was not a "mere pretext" to discover what was contained in the rear portion of the Sedacca vehicle.

252 Md. at 221–22, 249 A.2d 456 (underlining supplied; italics in original).

Fourteen years later, in *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), the Court of Appeals recognized that

an arrest may not be used as a pretext to search for evidence. Additionally, this Court has stated that *when an arresting officer has two or more purposes for making an arrest, one of which is to make a valid arrest for the commission of the crime and the other of which is to obtain evidence of a different crime, the duality of purpose will not, in an of itself, transform the arrest into a pretext arrest.*

(Emphasis supplied; citations omitted).

The notion of "duality of purpose" expressed in both *Foster* and *Sedacca* was reaffirmed by this Court more recently in *Thanner v. State,* 93 Md.App. 134, 141, 611 A.2d 1030 (1992). Chief Judge Wilner, writing for our Court, there said:

The thrust of *Foster* and *Sedacca* is that, *if there is a valid basis for making a stop,* including observation of a legitimate traffic violation, *the fact that the officer made the stop in the hope of obtaining evidence of some other crime does not make the stop unlawful. ... [S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry.*

(Citations and quotations omitted; emphasis supplied).

■ In the instant case, Detective Golian had two distinct purposes when arresting the appellant on December 22, 1997. The first purpose was to arrest him for an outstanding traffic warrant. That warrant was presumptively valid and no attempt has been made by the appellant, either at trial or on appeal, to argue otherwise. The second purpose was to

gather information from the appellant about his potential involvement in the Livesey rape. As we made abundantly clear in *Thanner*, "if there is a valid basis for making a stop ... the fact that the officer made the stop in the hope of obtaining evidence of some other crime does not make the stop unlawful." 93 Md.App. at 141, 611 A.2d 1030.

After the police made the objectively unassailable arrest of the appellant on the outstanding warrant and brought him to the station house, the fact that they did not follow their ordinary pattern or habit in processing such an arrestee is immaterial. We know of no law that would inhibit them from photographing the appellant after bringing him to the station house on an outstanding arrest warrant.

Even if, *arguendo*, the photographs of the appellant at the time of his arrest on December 22, 1997, were erroneously not suppressed, we are persuaded beyond a reasonable doubt that such an assumed error would have been harmless. We have looked at the photographs and they are completely innocuous. They are not at all lurid or dramatic. The so-called scratch mark under the eye would pass for a very minor and faded wrinkle. The so-called nicks on the hands appear on the photographs to be nothing more than a couple of dots.

The evidence of scratches on the appellant's face and hands was much more vividly introduced by no less than four eyewitnesses. Detective David Anderson testified that when he came into contact with the appellant on December 22, he noticed the scratch mark on the appellant's eye and "what looked like nicks on his hands." Detective Paula Hamill testified that she, at the same time, had noticed an injury under the appellant's left eye and healing injuries on his hands. Tammy Mindick, an acquaintance of the appellant through her boyfriend, recalled how the appellant had unexpectedly arrived at her home by taxicab at about 5:30 a.m. on the morning of the rape. She testified further that she noticed fresh scratches on his face. Brian Schwartzback testified that when he saw the appellant several days after the attack on Ms. Livesey, the appellant had one of his hands

wrapped in a gauze bandage. There was no objection by the appellant to this testimony on the part of any of the four witnesses. If anything, it seems to us as if the appellant himself would have wished to introduce the photographs of December 22 in order to minimize the testimony given by the four eyewitnesses. In any event, the photographs were harmless.

In terms of the harmlessness of any arguable error, moreover, the whole subject of scratches on the appellant's face and hands was with respect to one circumstance offered to help prove his criminal agency. The other circumstantial evidence of that criminal agency, however, was overwhelming. The DNA evidence, of course, clinched the proof of his criminal agency to a mathematical certainty.

### The 1991 Search and Seizure Warrant

Shortly after the crime occurred, a nurse practitioner at the Shady Grove Hospital took from the victim both 1) fingernail scrapings and 2) a rectal swab that contained a small amount of sperm. Following the arrest of the appellant, the police decided to request a DNA analysis, comparing the DNA found in the fingernail scrapings and on the rectal swab with DNA obtained in a blood sample of the appellant. The DNA analysis was to be done by the Cellmark Laboratories.

The police applied for and obtained a warrant from Judge DeLawrence Beard authorizing them to take a sample of the appellant's blood. Before they executed that warrant, however, they learned that they were already in possession of a sample of the appellant's blood that had been taken from him, pursuant to a warrant, in connection with a rape investigation that took place in 1991. In communications between the Montgomery County Police Department and Cellmark, Cellmark indicated that the 1991 blood sample would be all that would be required for a valid DNA test and that no additional blood sample was required. Accordingly, the warrant issued by Judge Beard, authorizing the police to take a new sample of the appellant's blood, was never executed.

It is the fact that a sample of the appellant's blood was taken in 1991 and was still available for testing in 1998 that is the unusual factual wrinkle in this case. On March 29, 1991, Laurie Denlinger was abducted and raped in Montgomery County. At about the same time, Irene Cackitt and one other woman were also the victims of attempted abductions. All three incidents occurred within a close geographic radius. The appellant was under investigation for having committed all three offenses and he was actually arrested for the Denlinger abduction and rape.

Pursuant to that investigation, the police obtained from Judge William C. Miller a search and seizure warrant authorizing them to take a sample of the appellant's blood. A blood sample was taken and remained in the custody of the police. The present record does not tell us the nature of the test that was to be performed in 1991. In any event, that test was not ultimately performed. At a police lineup in which the appellant was standing, the victim made a positive identification of someone other than the appellant. Under the circumstances, the State chose not to pursue further the 1991 charges against the appellant.[4]

In his fourth contention, the appellant turns his focus on the 1991 warrant signed by Judge Miller and authorizing the police to take a sample of the appellant's blood for purposes of DNA testing. Unfortunately, both the appellant's argument and the State's response blur the issue that is before us. It is not clear whether we are being called upon to review 1) an ordinary suppression hearing where the challenge is that the application for a search warrant does not adequately establish probable cause for the issuance of the warrant, 2) a request

---

4. As a result of DNA testing in 1998, charges against the appellant for the 1991 crimes against Laurie Denlinger were refiled. On October 25, 1999, he was found guilty of rape in the second degree of Ms. Denlinger. He received a sentence of twenty years imprisonment, to be served concurrently with his sentence in this case. The kidnapping and robbery charges were *nol prossed*.

For his present convictions, the appellant received a sentence of life imprisonment plus thirty-five years.

for permission to conduct a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to establish that the application for the warrant was tainted, or 3) an actual *Franks* hearing itself. In this case, it clearly is not the latter. At times, however, what is before us appears to be a strange hybrid of the first two.

## A Suppression Issue Proper

■ We hold that what is, or at least what should be, before us is a routine suppression hearing issue. Judge Miller issued the warrant on April 4, 1991 that authorized the taking of the appellant's blood. Had the case against the appellant gone forward at that time, had that warrant been the subject of a suppression hearing in that case, and had it been ruled constitutional, it would not have been necessary for Judge Kavanaugh to have revisited that ruling in this case. Because the case against the appellant in 1991 did not go forward, however, the April 4, 1991, warrant was never the subject of a suppression hearing. Under the circumstances, it was perfectly proper for it to be challenged for the first time at a pretrial suppression hearing in this case.

■ When a challenge is made to the issuance of a search warrant on the ground that the application for the warrant did not establish probable cause, witnesses are not ordinarily called. All that is required is for the hearing judge to assess what is contained within the four corners of the application for the warrant. In *Valdez v. State*, 300 Md. 160, 168–69, 476 A.2d 1162 (1984), Judge Couch made very clear the limited compass of what was to be reviewed:

> The rule in Maryland is that consideration of the showing of probable cause should ordinarily be confined solely to the affidavit itself. *Smith v. State*, 191 Md. 329, 335–36, 62 A.2d 287, 289–90 (1948). The rule, however, prevents consideration of evidence that seeks to supplement or controvert the truth of the grounds stated in the affidavit. *Id.; Carter v. State*, 274 Md. 411, 439, 337 A.2d 415, 431 (1975). The existence of grounds showing probable cause must ordinarily be shown within the four corners of the affidavit. *See*

*also Collins v. State,* 17 Md.App. 376, 381, 302 A.2d 693, 696 (1973).

*See also Birchead v. State,* 317 Md. 691, 700, 566 A.2d 488 (1989)("In determining whether probable cause exists, the issuing judge is confined to the averments contained in the search warrant application."); *Smith v. State,* 191 Md. 329, 335–36, 62 A.2d 287 (1948).

At the outset of the suppression hearing before Judge Kavanaugh on October 19, 1998, no special request was made by the appellant for a *Franks v. Delaware* "taint hearing" that would entail the possible calling of live witnesses. Bizarrely, however, extensive testimony was taken from Detective Patricia Pikulski, who was the key investigator of the 1991 crime with which the appellant was originally charged and the affiant on the April 4, 1991, warrant. There was also testimony, significantly briefer, from Officer Patrick Word. The key defense effort was to persuade Judge Kavanaugh to disregard at least some of the averments of Detective Pikulski as having been made in reckless disregard of their truth.

There was offered before Judge Kavanaugh what came in as State's Exhibit No. 6, an authentic copy of the signed original warrant. When the State finally argued as to the establishment of probable cause, it referred to the warrant application on a paragraph-by-paragraph basis. The testimony of Detective Pikulski essentially duplicated, however, what was in Detective Pikulski's original affidavit/application. In the discussions between court and counsel before the final ruling, the references at times randomly wandered back and forth between what Detective Pikulski had put in the warrant application in 1991 and what she testified to in the hearing of 1998. Because there was no apparent difference, however, between Detective Pikulski's two versions, this seemed to have been a distinction without a difference.

The issue in dispute was whether the descriptions of their assailants by Laurie Denlinger and others were sufficient to pinpoint the appellant as the probable culprit. The key

description had been given to Detective Pikulski by Ms. Denlinger herself:

She [Ms. Denlinger] said he was a black male, 6'2 to 6'3, 22 years old, dark complected, 190 to 200 pounds, well built, muscular. He wasn't fat, hair was very short on the sides, slightly long and fuller at the top, a slim thin mustache and a five o'clock shadow.

He had a metal watch on his left arm; although, it may have been a gold bracelet. He had an average nose, slightly broad lips. His facial skin was clear.

He was clean-cut. He had a ski jacket on with no hood, and she described the ski jacket to me, its design, and then eventually I had her draw—make a drawing of that ski jacket because it seemed unusual in description.

[H]er initial description: It was white in color with a royal blue "V" from the arms of the jacket down to a point in the midriff area, also a "V" in the back and a front zipper . . . there may have been a yellow accent stripe under the blue "V," and then she gave other clothing description.

Detective Pikulski also interviewed some of the appellant's family members in connection with the 1991 incident. Alice Wilson, the appellant's sister, stated that around the same time of the Denlinger rape and abduction, she (Ms. Wilson) had seen the appellant wearing a "white Vortex jacket with a 'V' in the back." She further described the "V" as "light blue," and she mentioned no other colors on the jacket. Detective Pikulski further noted that David Wilson, the appellant's brother,

identified the jacket and stated that he had bought a jacket very similar to that from a friend named Bill who lives in Gaithersburg, and he described the jacket very closely as Ms. Denlinger did, and he said that his brother Raymond . . . wore it a lot of the time and had been wearing it recently.

William Davis, also the appellant's brother, identified the drawing made by Ms. Denlinger as the jacket that "he had

seen his brother wearing days before [his] interview [with Detective Pikulski]."

In the course of her investigation, Detective Pikulski showed the Denlinger drawing of the jacket to Officer Patrick Word, who was investigating the attempted abduction of Irene Cackitt. Shortly after Ms. Cackitt's attempted abduction, she was asked whether she could identify the appellant as her assailant during a show-up identification. Officer Word testified that at the time of the show-up, the appellant was wearing a white nylon jacket "that was predominantly blue, and white, and gold ... or yellow," with "small trim" red in color and "a Chevron or 'V' style." During the show-up, Ms. Cackitt explained that "the jacket was right. The build and the face seemed right, but she ... did not remember the red trim on the jacket, nor did she remember the pants." In light of Ms. Cackitt's failure positively to identify the appellant as her assailant, the appellant was released.

Based on all of the information gathered by Detective Pikulski, she applied for a warrant for the seizure of blood samples from the appellant. In the application for the warrant, Detective Pikulski asserted:

On 4/03/91, [the appellant], who matches the physical description of Denlinger's assailant and had been *wearing a jacket of the same colors and design as Denlinger's assailant,* was arrested for kidnapping and attempted kidnapping. These were two separate incidents which occurred within four (4) miles of the area in which Denlinger was kidnapped.

(Emphasis supplied). The warrant was thereafter issued.

Although defense counsel argued at the hearing that some of Detective Pikulski's averments—particularly her conclusion that the appellant "matches the physical description of Denlinger's assailant"—should have been discounted because of some discrepancies in the descriptions given by various individuals, it seems clear that Judge Kavanaugh treated defense counsel's argument simply as argument on the significance of what was contained within the four corners of the warrant

application. As she ruled that the 1991 warrant had been validly issued, her conclusion was clear:

*[T]he State has pointed out that ... we have to look at the four corners of the warrant and determine whether or not Judge Miller, at the time he looked at it, could have found probable cause.*

I do think there is corroboration of the details of the crime. I think the physical description matches enough for probable cause. Apparently the defendant was arrested for the two other incidents, even though that has not been impeached.[?]

The jacket, I think, is the dispositive fact because there was a drawing by Denlinger, and the Chevron or the V is a very dispositive fact there, and basically the colors—most people mention the same colors, especially the white and the blue.

The fact that defendant was seen four miles from the crime scene 25 minutes after and the defendant's statement that he was robbed, that could be taken as a fact by Judge Miller that maybe that was some attempt of the defendant to fabricate it after he admitted owning a jacket.

So I do think there was probable cause.

(Emphasis supplied).

All of the witnesses interviewed by the police in conjunction with the 1991 incidents described in detail the appellant's jacket as white with a blue "V" located on it. The mere fact that some witnesses may have observed a second, thinner or "accent" stripe in a color other than blue or white is inconsequential to the determination of probable cause. All of the witnesses identified and/or described a very particular type of jacket that the appellant was wearing. As the suppression judge aptly noted, "the Chevron or the 'V' is a very dispositive fact there ... most people mention the same colors, especially the white and the blue."

■ In view of the very strong deference that should be extended to Judge Miller's 1991 determination that probable cause existed for the issuance of a warrant, *Illinois v. Gates,*

462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), we cannot say that Judge Kavanaugh was in error in upholding the validity of that 1991 search warrant.

### The Shadow Presence of
### *Franks v. Delaware*

Perhaps only because of the stubbornly persistent argument of appellant's counsel, the specter of *Franks v. Delaware* hovers about this case although it was never formally established that *Franks v. Delaware* had any business in this case. A suppression hearing and a *Franks* hearing are, albeit related, very different animals. In the appellant's brief, there is the routine contention that the 1991 warrant "was not supported by probable cause." In the course of the brief, however, reference is made to "the *Franks* hearing which took place on October 19, 1998."

Although the appellant never formally requested a *Franks* hearing and never made the required threshold showing that might have entitled him to a *Franks* hearing, he nonetheless received the full procedural benefit of a *Franks* hearing. Instead of being confined to arguing within the four corners of the application for the 1991 warrant, the appellant had the benefit of cross-examining at length Detective Pikulski, who was the affiant on that warrant. He was given the unlimited opportunity to probe Detective Pikulski as to why she included in the application what she did and why she omitted what she did. Procedurally, this is all that anyone would be entitled to even at a formally convened *Franks* hearing.

*Franks v. Delaware* established a formal procedure that must be satisfied before a defendant will be permitted to look beyond the four corners of a warrant application and to examine live witnesses in an effort to establish that a warrant application was tainted by perjury or reckless disregard of the truth. The Supreme Court set out that procedure, 438 U.S. at 155–56, 98 S.Ct. 2674:

[W]here the defendant makes *a substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that *a hearing be held at the defendant's request.* In the event that *at that hearing* the allegation of perjury or reckless disregard is *established by the defendant by a preponderance of the evidence,* and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

(Emphasis supplied).

The Supreme Court elaborated on what precisely must be established preliminarily even to require an evidentiary hearing:

*To mandate an evidentiary hearing,* the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.

438 U.S. at 171, 98 S.Ct. 2674 (emphasis supplied). It is also clear that the falsity or reckless disregard that must be shown is that of the affiant alone and not that of mere informants:

The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Id.*

It is furthermore clear that mere negligent omissions to include arguably exculpatory material in a warrant application or minor discrepancies in stories or descriptions supplied

by different witnesses do not constitute the predicate that would entitle one to a *Franks* hearing:

Allegations of negligence or innocent mistake are insufficient.

*Id.*

The Court of Appeals has been very clear that these prescribed procedural steps must be taken before a defendant is even entitled to a *Franks* hearing. In *McDonald v. State,* 347 Md. 452, 471–72 n. 11, 701 A.2d 675 (1997), Judge Raker explained for the Court:

*Franks v. Delaware* set out *a procedure, requiring* a detailed proffer from the defense *before the defendant is even entitled to a hearing to go behind the four corners of the warrant.* Under *Franks,* when a defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included false statements in the supporting affidavit for a search warrant, and that the affidavit without the false statement is insufficient to support a finding of probable cause, *the defendant is then entitled to a hearing* on the matter. *The burden is on the defendant* to establish knowing or reckless falsity *by a preponderance of the evidence* before the evidence will be suppressed. *Negligence or innocent mistake resulting in false statements in the affidavit is not sufficient* to establish the defendant's burden. *Id.* at 171–72, 98 S.Ct. at 2684–85; *see also United States v. Corral–Corral,* 899 F.2d 927, 933–34 (10 th Cir.1990)(no showing that warrant issued in reliance on a deliberately or recklessly false affidavit; *record unclear whether defendant even requested a Franks hearing.*)

(Emphasis supplied).

The appellant attempted to argue at the suppression hearing of October 19, 1998, that because of certain omissions and certain discrepancies in the descriptions given of the appellant, the affidavit of Detective Pikulski was made in reckless disregard of the truth. In his brief, the appellant writes:

The rape victim's [Ms. Denlinger's] description of the jacket worn by her assailant was the primary basis for the affiant's determination that the appellant had committed all

three offenses. Yet, the officer failed to include the rape victim's description of her assailant's jacket in the warrant application or to provide information regarding the differences in description of the jacket worn by the assailant in other offenses.... *In light of the different descriptions of the assailant's jacket that were given by the victims of the three offenses, Officer Pikulski's statement was affirmatively misleading. At the very least, it demonstrated a "reckless disregard for the truth."*

(Emphasis supplied).

At the end of the somewhat hybrid suppression hearing, Judge Kavanaugh recognized what defense counsel wanted her to do. In the last analysis, however, she agreed with the State that the decision as to whether the 1991 warrant application spelled out probable cause was one that should be made by looking "at the four corners" of that warrant application:

[Defense counsel] argues on behalf of the defendant that the defendant does not match the physical description of Denlinger's assailant, and he calls this a reckless disregard for the truth when the conclusory statement is put into the affidavit.

Also, he challenges the description, "Jacket of the same colors and design," because of some discrepancy about whether or not yellow was in it. He challenges the fact in the affidavit that states that the defendant was arrested for the two incidents.

He also challenges the fact that Davis fled from the scene because we are not sure at that time who it was because that victim, Cackitt, was not able to make an eyewitness identification, and *he asked me ... to look at the search warrant and to suppress it based on the Franks exception.*

*[T]he State has pointed out that ... we have to look at the four corners of the warrant and determine whether or not Judge Miller, at the time he looked at it, could have found probable cause.*

(Emphasis supplied).

Judge Kavanaugh never determined by a bare preponderance of the evidence or by any other standard whether 1) any

statement in the warrant application by Detective Pikulski had been made with reckless disregard for its truth or 2) if so, whether that particular statement was indispensable to the establishment of probable cause. It is our conclusion that no such rulings were required. In any event, when Judge Kavanaugh's final ruling was of the type ordinarily made at a routine suppression hearing and was not a *Franks* ruling, defense counsel lodged no objection and was, indeed, completely acquiescent:

> So I do think *there was probable cause* ... and *I am going to allow the warrant to stand.*

[Defense Counsel]: *Thank you, Your Honor.*

(Emphasis supplied).

* * *

This was not a happy contention with which to deal, not because the correct ultimate result is not clear but because what should have been cleanly differentiated issues were jumbled together in a hopeless amalgam.

### An Alternative Rationale: The Good Faith Exception to the Exclusionary Rule

Even if, *arguendo*, the application for the 1991 warrant application fell short of probable cause, the officers who executed it and took the appellant's blood acted in reasonable reliance on it. No deterrent purpose, therefore, would be served by applying the Exclusionary Rule. *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See also McDonald v. State,* 347 Md. 452, 466–74, 701 A.2d 675 (1997).

### A Second Alternative Rationale: Inevitable Discovery

Even if, *arguendo*, 1) the 1991 warrant were not supported by probable cause and 2) the "good faith" exception to the Exclusionary Rule were not available, the exclusion of the evidence—the blood sample—would still not be called for. As acknowledged by defense counsel at the suppression hear-

ing, the State had procured a search and seizure warrant for the appellant's blood from Judge Beard in 1998 in the investigation of the Livesey rape. The only reason it was not executed was because the 1991 blood sample was still available.

If the 1991 warrant had never existed, the appellant's DNA characteristics would inevitably have been discovered in any event by virtue of the 1998 warrant. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received.") (Footnote omitted); *see also Oken v. State*, 327 Md. 628, 654, 612 A.2d 258 (1992) (discussing inevitable discovery doctrine), and *Rice v. State*, 89 Md.App. 133, 138, 597 A.2d 1001 (1991)(same).

### Use of 1991 Blood Sample for DNA Testing in 1997 Investigation

 The appellant finally claims that the testing of his blood, taken pursuant to the 1991 warrant, in the present 1997 case was improper. He poses the critical question:

> Whether an individual whose blood has legitimately come into the possession of the police nonetheless retains a privacy interest in that blood sufficient to prevent its further examination outside the purview of the original warrant.

The appellant argues that because no second, independent warrant was issued to examine the 1991 blood sample, his Fourth Amendment rights were violated. We disagree.

It is undisputed that the appellant enjoyed a Fourth Amendment interest not to have the police invade his body and take a sample of his blood except when authorized to do so by a search warrant or court order. *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held squarely:

The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained.

\* \* \*

The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

See also Mills v. State, 28 Md.App. 300, 305, 345 A.2d 127 (1975) ("[A]ll blood tests are seizures subject to the reasonableness requirement of the Fourth Amendment[.]")

What the appellant overlooks is that on the only occasion the Montgomery County police invaded his body to take a sample of his blood, they did so only under the authority of the search and seizure warrant initially issued by Judge Miller in 1991 and subsequently upheld by Judge Kavanaugh in 1999. In arguing that a second use may not be made of that original sample without the obtaining of a second warrant, the appellant is asserting an ongoing privacy interest in the identifying characteristics of his blood. He is asserting that a new court authorization is required before the police may look into those identifying characteristics for a new purpose.

As we shall now analyze, no such fresh authorization is required. Even if we were to assume, arguendo, that some fresh authorization were required, however, that authorization was present in this case. Based on a number of supporting circumstances, probable cause was established to justify looking at the appellant's blood for its tell-tale DNA characteristics in the present case. That was the essential thrust of Judge Beard's presumptively valid 1997 warrant. The same probable cause that authorized the taking of a new blood sample and its DNA testing would, for Fourth Amendment purposes, have justified the retesting of the original blood sample. The DNA signature that the appellant seeks to protect as private is a common denominator characteristic,

regardless of which blood sample is used to read that signature.

*People v. King*, 232 A.D.2d 111, 663 N.Y.S.2d 610 (App.Div. 1997), addressed the identical issue with which we are now confronted. In holding that the defendant's Fourth Amendment rights were not violated when a blood sample validly obtained in connection with a rape investigation was used in a subsequent unrelated rape case, the New York Appellate Division explained:

> [O]nce a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. *Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body,* and the scientific analysis of a sample does not involve any further search and seizure of a defendant's property. In this regard we note that the defendant could not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. *Although human blood, with its unique genetic properties, may initially be quantitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests.*

663 N.Y.S.2d at 614 (emphasis supplied).

The Court of Appeals of Georgia reached the same conclusion as *King* in the case of *Bickley v. State*, 227 Ga.App. 413, 489 S.E.2d 167 (1997). In *Bickley*, authorities had previously obtained, pursuant to a valid warrant, blood samples from the defendant for DNA testing in connection with a rape case. Those samples were then subjected to additional DNA testing when the defendant was investigated for additional rapes in another county. Despite the defendant's argument that his Fourth Amendment rights were violated by the subsequent DNA testing, the Georgia court held:

In this case the defendant's blood was obtained pursuant to a warrant for the purpose of DNA testing, and that is the only test that was ever performed on defendant's blood. And *no matter how many times defendant's blood is tested, the DNA results would be identical.* What defendant is really objecting to is the comparison of his DNA with DNA derived from samples taken from the victims of crimes other than the one specified in the search warrant. We agree with the trial court that "[i]n this respect, *DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations.*"

489 S.E.2d at 170 (emphasis supplied). *See also Washington v. State,* 653 So.2d 362 (Fla.1994)(Once blood samples obtained from defendant, "the police were not restrained from using the samples as evidence in [an unrelated case].")

The appellant cites *State v. Binner,* 886 P.2d 1056, 131 Or.App. 677 (1994), as being "on point" with the case now before us. The appellant is mistaken. In *Binner,* the defendant was charged with manslaughter in connection with an automobile accident. Immediately following the accident, the defendant was transported to a hospital. While there, an officer asked whether the defendant would consent to (1) providing a blood sample to be tested for alcohol and (2) providing a urine sample to be tested for drugs. The defendant consented to the former but refused the latter request. The tests of the blood sample revealed that the defendant's blood alcohol content was below the legal limit. Two weeks after the blood was drawn, however, the police, without informing the defendant and without obtaining a warrant, tested the blood sample for possible drugs. Those tests came back positive for marijuana. 886 P.2d at 1057.

At trial, the defendant moved to suppress the results of the blood test on the theory that any test beyond that for blood alcohol content exceeded the scope of the defendant's consent. The trial court granted the defendant's motion. The Oregon Court of Appeals affirmed that suppression, holding as follows:

Having determined that defendant has a privacy interest in the contents of his blood, the next issue is to what extent, if any, he intended to protect that interest when he executed the consent. Defendant expressly refused to consent to a test of his urine for drugs. His written consent is expressly limited to a test for alcohol content. *The scope of a consent to search is determined by the consenting person.* The necessary implication of defendant's limitation on the authority of the police to test the contents of his blood is that he did not intend them to test the sample for drugs. Under the circumstances, defendant has manifested an intention to protect his privacy interest to that extent. Nor can it be said that defendant intended to abandon his privacy interest in the blood sample. Although he may not have intended that the sample be returned to him, and thus waived his possessory interest in the sample, his privacy interest in its contents continued despite the fact that the police were in possession of it.

886 P.2d at 1059 (emphasis supplied).

*Binner* is distinguishable from the instant case. First, the initial blood sample taken in *Binner* was pursuant to the defendant's consent. Here, the 1991 sample taken from the appellant was pursuant to a judicially issued search and seizure warrant. The defendant in *Binner* expressly limited his consent to one particular type of testing only, *i.e.*, blood alcohol content. Here, there was no such limitation nor was the appellant in any position to impose a limitation. Because the instant case has nothing to do with the permitted scope of a consensual search, *Binner* is totally inapposite.

The other authority on which the appellant relies is the Supreme Court decision in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). The principles enunciated in that opinion are not at all apposite to the issue now before us. There had been in the *Walter* case an unauthorized opening by private persons of a package being sent to the defendants. Because those private persons were not State agents, the Fourth Amendment did not apply to their original unauthorized opening of the package. Inside

the package were smaller boxes advertising their contents as pornographic films. When the FBI agents arrived, they opened the boxes, placed the films on projectors, and reviewed the contents, thereby discovering that the films were, indeed, pornographic.

The Supreme Court decision held that the further examination, revealing what was not readily apparent and what had not theretofore been revealed, constituted a Fourth Amendment search and had, therefore, to satisfy the Amendment's reasonableness requirement. The government could not conduct such a search in the absence of any prior Fourth Amendment justification. The *Walter* opinion did not involve in any way an initial Fourth Amendment intrusion that had been justified and then a subsequent reexamination of what had validly been seized. In the case now before us, the Fourth Amendment intrusion had been justified by Judge Miller's 1991 warrant commanding the police to enter the appellant's body and withdraw his blood. *Walter v. United States* has nothing to do with a reexamination of evidence already in lawful police custody.

In *Gee v. State,* 291 Md. 663, 435 A.2d 1387 (1981), the Court of Appeals rejected an analogous argument based on *Walter v. United States.* In that case, evidence had been lawfully seized by District of Columbia authorities. The defendant there argued that a subsequent examination of the seized items by Maryland authorities required a fresh Fourth Amendment authorization. In squarely rejecting that argument, Judge Rodowsky's opinion for the Court of Appeals summarized and cited with approval numerous federal and state authorities. Among them, 291 Md. at 671, 435 A.2d 1387, he cited with approval:

> *United States v. Gargotto,* 476 F.2d 1009, 1014 (6th Cir.1973)("Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken."); *United States v. Romero,* 585 F.2d 391, 396 (9th Cir.1978)(" '[E]xamination by another law enforcement agency is not a sufficiently distinct intrusion into the

defendants' privacy to trigger the requirements of the Fourth Amendment.' "); *Westover v. United States*, 394 F.2d 164, 165 (9th Cir.1968)("[A] search warrant to again look at the money already in police custody does not make sense.").

If further support were needed for this proposition, it would be readily available in the analogue of fingerprint data banks. Without an individual's consent, fingerprints, as surely as blood samples for DNA testing, may only be taken pursuant to a warrant or other court order. *Davis v. Mississippi*, 394 U.S. 721, 727–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Once the police are in reasonable possession of the fingerprints, however, those fingerprints are kept on file, nationally by the FBI and by every state, so that they are available for future criminal investigations. No further Fourth Amendment authorization is required for the police freely to comb such fingerprint banks to seek out and to identify criminals. Indeed, it is difficult to conceive of a modern law enforcement system without such fingerprint banks.

Within the span of less than two decades, we have witnessed the emergence of DNA identification as an investigative breakthrough rivaling the breakthrough effected by fingerprint identification in the early decades of the Twentieth Century. As of 1999, all fifty states now require designated sets of convicted felons to provide DNA samples for analysis. Donnelly & Friedman, *DNA Database Searches and the Legal Consumption of Scientific Evidence*, 97 Mich. L.Rev. 931, 939 (1999). The federal government has been promoting the development of a national DNA database with the DNA Identification Act of 1994. See also Manning A. Connors, III, *DNA Databases: The Case for the Combined DNA Index System*, 29 Wake Forest L.Rev. 889 (1994); Susan M. Dadio, *Maryland's DNA Data Base System and Repository: Does It Pass Constitutional Muster?*, 25 U. Balt. L.Rev. 47 (1995); Harold J. Krent, *Of Diaries and Data Banks: Use Restrictions Under the Fourth Amendment*, 74 Tex. L.Rev. 49, 80–82 (1995); Robert Craig Scherer, *Mandatory Genetic Dogtags and the Fourth Amendment: The Need for a New Post–*

*Skinner Test,* Geo. L.J.2007 (1997). The Maryland State Police are authorized to maintain a DNA data bank under provisions now spelled out by Art. 88B, § 12A. The admissibility of DNA profiles is spelled out by Cts. & Jud. Proc. Art., § 10–915.

Once an individual's fingerprints and/or his blood sample for DNA testing are in lawful police possession, that individual is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the window of the burglarized house or the steering wheel of the stolen car. The development of such a new and scientifically reliable investigative tool should give rise, in any sane society, not to a cry of alarm but to a sigh of relief. By the same token, photographs, handwriting exemplars, ballistics tests, etc., lawfully obtained in the course of an earlier investigation are freely available to the police in the course of a new and unrelated investigation. No new Fourth Amendment intrusion is involved.

No violation of the appellant's Fourth Amendment rights occurred in this case. The police were not required to obtain and execute a second warrant in 1998 for the testing of the appellant's blood samples already seized pursuant to the 1991 warrant. Any legitimate expectation of privacy that the appellant had in his blood disappeared when that blood was validly seized in 1991. The further testing of the identical blood sample with relation to the Livesey rape did not offend constitutional principles. Judge Kavanaugh's ruling was eminently correct:

> I agree with the State on this. I don't think a second warrant was necessitated given the facts of this case.
>
> Once they did the search of your client's body to obtain the blood, which was the seizure, then further testing did not require another warrant, so I am going to deny your motion on that point.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*